# United States Court of Appeals

## For the Eighth Circuit

_____

No. 12-4000

_____

Cody Lee Walton

*Plaintiff - Appellee*

v.

Robert Dawson

*Defendant - Appellant*

Jon Dwiggins; Nathaniel Eugene Flennory; Drew Belt; Alan R. Wyatt; Unknown Deputy

*Defendants*

David Moore

*Defendant - Appellant*

Michael Shively, Macon County Deputy Sheriff in his official and individual capacity; Adair County Commission, in their official capacity; Unknown Macon County Deputy, Sheriff in his official and individual capacity; Gary D. Jones, Commissioner of Adair County, Missouri, in his individual and official capacity; Robert T. Hardwick, Sheriff of Adair County, Missouri, in his individual and official capacity

*Defendants*

_____

Appeal from United States District Court
for the Eastern District of Missouri - Hannibal

_____

Submitted: September 26, 2013
Filed: May 20, 2014

_____

Before RILEY, Chief Judge, BYE and GRUENDER, Circuit Judges.

_____

RILEY, Chief Judge.

While in pretrial detention at the Macon County Jail (jail) in Missouri, Cody Lee Walton was the victim of a sexual assault. A troubled youth who bounced in and out of foster care, Walton was nineteen years old and weighed 135 pounds at the time of the assault. The thirty five year old rapist, Nathan Flennory, was a 195-pound registered sex offender with a history of violence: he stood convicted of second-degree assault on a law enforcement officer, domestic assault, and unlawful use of a weapon, and just four days before his assault on Walton, he pled guilty to forcible rape. Because the jailer did not lock the cell doors at night, Flennory was able to enter Walton's cell, threaten to "kill [Walton] in [his] sleep," and leave Walton physically bloodied and emotionally bruised.

Walton brought federal claims under 42 U.S.C. § 1983 and pendent state law claims against those he considers responsible for the assault. At issue in this interlocutory appeal are Walton's Fourteenth Amendment failure to train claims against Robert Dawson, the sheriff of Macon County, and David Moore, the jail administrator (collectively, officials). On summary judgment, the district court denied both officials qualified immunity, concluding the facts showed the officials were indifferent to the known risk posed by leaving cell doors unlocked overnight while Flennory was an inmate. Although the district court denied Moore qualified immunity based on a careful, individualized assessment, the district court offered no particularized basis to deny Sheriff Dawson qualified immunity. We exercise our limited interlocutory jurisdiction, affirming in part and reversing in part.

## I.    BACKGROUND[1]

Walton arrived in the jail on August 25, 2010, after extradition from Indiana, to face charges relating to the theft of an automobile and carrying a gun without a permit—charges to which Walton later pled guilty and received a sentence of probation and community service.  At the time of the sexual assault, Walton had not yet been arraigned. Before the assault, the individual cell doors were never locked while Walton was an inmate.

The rape occurred in the predawn hours of August 30, 2010.  Flennory left his own unlocked cell, entered Walton's unlocked cell, and had Walton follow him back to his cell.  Walton did not call for help because he "was really terrified" and Flennory threatened, "Don't say a word, or I'll kill you."  Flennory sodomized Walton and again threatened to kill him.  After Flennory left him alone, Walton used toilet paper to wipe himself and saw blood running down his leg.  Walton then wrote a message on a piece of paper: "Please get me out of this cell.  I've been raped.  I'm bleeding . . . . I'm afraid that the man in the cell next to me is going to kill me."  Fearing Flennory might return, Walton hid the paper until a female guard delivered breakfast.  Presumably because Flennory in a nearby cell could overhear, Walton simply handed the paper to the guard and said nothing.  The guard left before reading the note, but quickly returned and removed Walton from the cell block.  Another officer took Walton to the local hospital, where he received treatment.

The jailer on duty the night of the assault was Ryszard Bilinski.  That was not the first night Bilinski left the cell doors unlocked.  Though the jail had an unwritten policy that doors were to be locked at night, Walton presented evidence the policy was routinely ignored.  On a prior occasion, Moore arrived at the end of Bilinski's night shift and learned Bilinski left the cell doors unlocked overnight.

---

[1]On this appeal from a denial of summary judgment under Fed. R. Civ. P. 56, we recite the facts in the light most favorable to the non-moving party, Walton.  See Brown v. Fortner, 518 F.3d 552, 557-58 (8th Cir. 2008).

Moore says he verbally reprimanded Bilinski, and Bilinski "indicated that he understood and that he would lock the jail cells down at night." Bilinski said that during the "almost three months" before the rape, Moore "*never questioned* [his] not-adhering to that rule." (Emphasis added).

Three months before the rape at issue in this case, Flennory entered another inmate's unlocked cell at night while the inmate was asleep and bit the inmate's penis. The inmate awoke and pushed Flennory away, then reported he had "been sexually assaulted." Moore admits he knew about this incident, but claims he did not know the inmate suffered "any physical injury . . . as a result of the incident." The inmate avers the assault drew blood. Flennory was temporarily placed in segregation, then returned to the general population shortly before Walton's rape after Flennory displayed suicidal tendencies and promised to behave.

Viewing this evidence in the light most favorable to Walton, the district court saw enough "to refute [the officials'] claim" that "they had no knowledge the jail cells were not being locked down at night." Based on Moore's personal knowledge of Bilinski's failure to lock the cell doors and the relatively recent assault involving another inmate, the district court found "Walton's submissions [on the failure to train claim] sufficient to survive summary judgment." Much of the district court's analysis focused specifically on Moore's culpability, and the district court only discussed Sheriff Dawson's knowledge in general terms. The district court "recognize[d] Walton's claim against Moore is stronger than that against Dawson."

It is undisputed that upon learning of Walton's rape, Sheriff Dawson issued written reprimands to both the jail administrator, Moore, and the jailer on duty, Bilinski. In his reprimand to Bilinski, the sheriff noted Walton's rape "was a very tragic event"—"one of the most serious events to occur in the jail during [his] time as Sheriff"—and emphasized "[t]he fact that another employee may not be following policy is no reason for [Bilinski] not to follow it." Bilinski "cited

-4-

training and equipment as well as the fact [he was] a new employee as [his] primary reason[s] for not following policy." Sheriff Dawson "w[ould] not accept them as a legitimate excuse for not following . . . the policy of locking the inmates down at night."

In his reprimand to Moore, Sheriff Dawson explained that had the "policy been followed[,] it may have prevented this very serious incident." The sheriff took "disciplinary action, for [Moore] not enforcing [the] policy," and "plac[ed] [Moore] on probation for the next 90 days." Sheriff Dawson noted that he had "learned from talking to [Moore] *after* the [sexual assault of Walton], [that] some of the jailers ha[d] not been adhering to th[e] policy on a regular basis." (Emphasis added).

Both officials appeal the denial of qualified immunity, and Walton moves to dismiss the appeal for lack of jurisdiction.

## II.   DISCUSSION

### A.   Jurisdiction

We begin with jurisdiction, which is always our "'first and fundamental question.'" Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998) (quoting Great S. Fire Proof Hotel Co. v. Jones, 177 U.S. 449, 453 (1900)). A denial of qualified immunity at the summary judgment stage "is immediately appealable if it 'resolve[s] a dispute concerning an abstract issu[e] of law relating to qualified immunity.'" Lockridge v. Bd. of Trustees of Univ. of Ark., 315 F.3d 1005, 1008 (8th Cir. 2003) (en banc) (alterations in original) (quoting Behrens v. Pelletier, 516 U.S. 299, 313 (1996)). Such a denial is not immediately appealable if it rests solely on a determination of "whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." Johnson v. Jones, 515 U.S. 304, 320 (1995). Questions of law may be appealed right away, but questions of fact may not. See, e.g., id. at 313-18.

-5-

This does not mean a district court can guide a case to trial without ever deciding the "essentially legal question" whether a defendant is entitled to qualified immunity. Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). Where a district court "simply d[oes] not rule on the qualified immunity issue," we have jurisdiction to require the district court to issue such a ruling. Craft v. Wipf, 810 F.2d 170, 173 (8th Cir. 1987) (per curiam). But it does mean that if the parties agree on the law but disagree about the facts, there is no issue for us to decide on an interlocutory appeal. See Aaron v. Shelley, 624 F.3d 882, 884 (8th Cir. 2010).

Applying these principles to this case, we have no jurisdiction at this juncture to decide whether "the district court's determination of evidentiary sufficiency" was correct. Thomas v. Talley, 251 F.3d 743, 747 (8th Cir. 2001). We can, however, accept the district court's factual findings as true and decide whether those facts, as a "purely legal issue," involve a clearly established violation of federal law. Johnson, 515 U.S. at 313. Because this is what the officials' appeal asks us to do, we have jurisdiction over this case under the collateral order doctrine. See Mitchell, 472 U.S. at 528-30.

We therefore deny Walton's motion to dismiss the appeal for lack of jurisdiction and now proceed to the legal merits.

### B.    Merits

On summary judgment, a defendant official is entitled to qualified immunity unless "(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." Howard v. Kan. City Police Dep't, 570 F.3d 984, 988 (8th Cir. 2009). District courts may consider these two questions in any order, but may not deny qualified immunity without answering both questions in the plaintiff's favor. See Pearson v. Callahan, 555 U.S. 223, 236 (2009). District courts must make reasoned "findings of fact and conclusions of

law" sufficient to permit meaningful appellate review of the qualified immunity decision.  Robbins v. Becker, 715 F.3d 691, 694 & n.2 (8th Cir. 2013).

Faced with an interlocutory appeal from the denial of qualified immunity, we accept as true the district court's findings of fact to the extent they are not "blatantly contradicted by the record," Scott v. Harris, 550 U.S. 372, 380 (2007), and review the district court's conclusions of law de novo, see Jones v. McNeese, 675 F.3d 1158, 1161 (8th Cir. 2012).  If the district court fails to make a factual finding on an issue relevant to our purely legal review, we "determine what facts the district court, in the light most favorable to the nonmoving party, *likely* assumed." Johnson, 515 U.S. at 319 (emphasis added).  Occasionally, a district court provides such scant factual analysis that this task is impossible, and we must remand for additional explanation.  See, e.g., Jones, 675 F.3d at 1162-63.  More often, we can decipher the district court's assumptions "by viewing the record favorably to the plaintiff *as in any other summary judgment motion*." Lockridge, 315 F.3d at 1008 (emphasis added).

Undertaking an individualized assessment of each defendant's entitlement to immunity, we review the applicable constitutional standard, then consider in turn each of the two officials' claims to qualified immunity.

### 1.    Constitutional Standard

As a pretrial detainee, Walton necessarily rests his failure to train claim against the officials on the Due Process Clause of the Fourteenth Amendment.  See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 244 (1983).  Although "the Eighth Amendment has no application" until there has been a "formal adjudication of guilt," the Fourteenth Amendment gives state pretrial detainees—just as the Fifth Amendment gives federal pretrial detainees—rights which are "*at least as great* as the Eighth Amendment protections available to a convicted prisoner." Id. (emphasis added).  The Constitution affords greater protection to a pretrial detainee compared to a convicted inmate in the sense that "[d]ue process requires that a

pretrial detainee not be punished." Bell v. Wolfish, 441 U.S. 520, 535 n.16 (1979). When this assault occurred, Walton had not been arraigned, much less convicted, so the Constitution shielded him not only from "cruel and unusual punishments," U.S. Const. amend. VIII, but from *any* punishment whatsoever. See Revere, 463 U.S. at 244; Bell, 441 U.S. at 535 n.16.

To succeed on a claim under the Due Process Clause of the Fourteenth Amendment, a pretrial detainee such as Walton must show the defendant official was *deliberately indifferent* to his rights. See Butler v. Fletcher, 465 F.3d 340, 345 (8th Cir. 2006). "Deliberate indifference" is a polysemous phrase. As applied to a prison official in the Eighth Amendment context, the Supreme Court has made it clear "deliberate indifference" requires subjective knowledge: no liability attaches "unless the official *knows of* and disregards an excessive risk to inmate health and safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994) (emphasis added). However, as applied to a municipality in the Fourteenth Amendment context, "deliberate indifference" is purely objective: "liability [may] be premised on obviousness or *constructive notice*." Id. at 841 (emphasis added); see also City of Canton v. Harris, 489 U.S. 378, 390 (1989). But the Supreme Court has never specified whether "deliberate indifference" is subjective or objective in the context of a Fourteenth Amendment claim against a municipal prison official. See, e.g., Spencer v. Knapheide Truck Equip. Co., 183 F.3d 902, 905-06 (8th Cir. 1999).

Without expressly answering this question,[2] we have used Farmer's subjective measure of deliberate indifference to evaluate Fourteenth Amendment claims by pretrial detainees against prison officials. See, e.g., Holden v. Hirner, 663 F.3d 336, 341 & n.3 (8th Cir. 2011). We recognize the potential inconsistency

---

[2]While Butler answered the question whether "deliberate indifference" is the appropriate test under the Fourteenth Amendment—identifying both objective and subjective components—what the phrase means, whether it is subjective or objective, was not disputed. See Butler, 465 F.3d at 345. After Butler we noted our "court has yet to establish a clear standard for pretrial detainees," Morris v. Zefferi, 601 F.3d 805, 809 (8th Cir. 2010) (internal quotation omitted).

this approach creates: the same claim (failure to train) by the same plaintiff (a pretrial detainee) arising under the same constitutional provision (the Due Process Clause of the Fourteenth Amendment) uses the same standard (deliberate indifference) in different ways depending on whether the defendant is the municipality or its employee. Theoretically, this could make a municipality liable for a risk it *should have* known even if all of its employees in supervisory roles *did not* know of the risk and are thus not liable. Compare Canton, 489 U.S. at 390 & n.10 (explaining a municipality may be liable because the risk was "obvious" or "must have been plainly obvious"), and id. at 396 (O'Connor, J., concurring and dissenting) (emphasizing that "actual or constructive notice" is enough), with Farmer, 511 U.S. at 841 ("Canton's objective standard . . . is not an appropriate test for determining the liability of prison officials under the Eighth Amendment.").

Despite this theoretical concern, our repeated practice of using Farmer in the Fourteenth Amendment context has been followed too long to be reconsidered here. See, e.g., Vaughn v. Greene Cnty., Ark., 438 F.3d 845, 850 (8th Cir. 2006). We therefore conclude Walton's failure to train and supervise claims must be judged by Farmer's subjective deliberate indifference standard. Which is to say, Walton must prove the prison officials *personally knew* of the constitutional risk posed by their inadequate training or supervision and proximately caused him injury by failing to take sufficient remedial action.[3] See Farmer, 511 U.S. at 837-39.

### 2.    Moore

Considering Moore's entitlement to qualified immunity, "the district court carefully explained the material disputed facts which, when viewed most favorably to [Walton], would permit a reasonable jury to find that" Moore's deliberate indifference violated Walton's constitutional rights. Aaron, 624 F.3d at 884. On

---

[3]By contrast, under Canton's less stringent objective standard, a defendant may be liable after receiving sufficient notice of the risk, even if that defendant does not personally know the risk exists.

interlocutory appeal, we are bound to accept the accuracy of the district court's findings because none is so "blatantly contradicted by the record . . . that no reasonable jury could believe it." Scott, 550 U.S. at 380; see also Johnson, 515 U.S. at 319. These findings adequately support the district court's legal conclusion that Moore is not presently entitled to qualified immunity.

### a. Moore's Failure to Train Violation

There is no doubt the right at issue—a pretrial detainee's right to be protected from sexual assault by another inmate—is clearly established. See, e.g., Curry v. Crist, 226 F.3d 974, 977 (8th Cir. 2000). It is equally beyond dispute that "[r]ape or sexual assault at the hands of other prisoners is . . . 'sufficiently serious to amount to a deprivation of constitutional dimension.'" Spruce v. Sargent, 149 F.3d 783, 785 (8th Cir. 1998) (quoting Jensen v. Clarke, 94 F.3d 1191, 1197 (8th Cir. 1996)). This leaves just one purely legal question relating to Walton's claim against Moore: Do the facts, as found by the district court, permit a reasonable jury to find that Moore violated this clearly established right?

"A prison official may be held liable under the Eighth Amendment if he or she knows that an inmate faces a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Coleman v. Rahija, 114 F.3d 778, 785 (8th Cir. 1997). This knowledge need not be particularized—Moore did not need to know Walton "was especially likely to be assaulted by the specific prisoner who eventually committed the assault." Farmer, 511 U.S. at 843. Moore only needed to know (1) the jail cells were not being locked at night, and (2) leaving the cells unlocked overnight was "an obvious, substantial risk to inmate safety." Id. The district court's specific factual findings satisfy this knowledge requirement at both steps.

At the first step, as the district court emphasized, Walton's evidence indicates the jail cells were never locked overnight even though unlocked cells led to a prior assault incident involving Flennory. Moore admits he was personally

aware of Bilinski's failure to lock the doors overnight on at least one occasion. At least three key pieces of evidence could lead a reasonable jury to reject Moore's testimony that he verbally reprimanded Bilinski and never discovered Bilinski continued to leave the inmates under his care in unlocked cells and at risk of being assaulted while they slept.

First, a reasonable jury could rely on Bilinski's unequivocal statement contradicting Moore's testimony: "For the period of almost three months [before the rape,] releasing officers[,] which in my case are *Dave Moore*[] and [another officer,] *never questioned* my not-adhering to th[e overnight cell locking] rule."[4] (Emphasis added). Even if the jury believed Moore reprimanded Bilinski once for failing to lock the doors, the jury could still infer from Moore's failure to verify whether Bilinski complied with his promise to follow the policy that Moore purposely avoided obtaining direct confirmation of what he "strongly suspected," id. at 843 n.8. <u>Farmer</u>'s subjective standard does not invite prison supervisors to bury their heads in the sand. <u>See</u> <u>id.</u> (explaining "a prison official . . . would not escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist").

Second, a reasonable jury, crediting testimony that the doors were never locked, could find the risk was so obvious that Moore, who personally worked in the jail, knew about that risk. <u>See</u> <u>id.</u> at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

Third, a reasonable jury could reject Moore's testimony based on the tone and content of Sheriff Dawson's written reprimand. The sheriff reported he had

---

[4]Bilinski's statement indicates the "releasing officers," including Moore, must have known the doors were not locked overnight because they were responsible for unlocking the doors at 8:00 a.m., approximately two hours after relieving Bilinski.

-11-

"learned from talking to [Moore] after the [rape of Walton that] some of the jailers *have not been* adhering to th[e] policy [of locking cell doors overnight] on a regular basis." (Emphasis added). The sheriff's comment supports the reasonable inference that Moore knew jailers were not adhering to the locked door policy, but did not come clean to his superior (Sheriff Dawson) or react to the problem until after the assault at issue in this case.

At the second step, Bilinski's failure to lock the doors overnight, and Moore's failure to train him to do so, presented an objectively obvious, substantial risk to detainees' safety in the particular context of this jail. See id. at 843. Detainees are most vulnerable when asleep, and the Constitution guarantees a minimum right to sleep without legitimate fear of a nighttime assault by another detainee. See, e.g., Hutto v. Finney, 437 U.S. 678, 681-82 & n.3 (1978); Harper v. Showers, 174 F.3d 716, 720 (5th Cir. 1999). "[S]leep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment." Walker v. Schult, 717 F.3d 119, 126 (2d Cir. 2013); see also, e.g., Obama v. Burl, 477 F. App'x 409, 411 (8th Cir. 2012) (unpublished per curiam) (finding an inmate's allegation "regarding constant lighting," which "caused inability to sleep, emotional distress, and constant headaches," was sufficient preliminarily to state an Eighth Amendment claim); Meloy v. Schuetzle, 230 F.3d 1363, 2000 WL 1160446, at *1 (8th Cir. 2000) (unpublished per curiam) (recognizing an inmate suffering from sleep apnea stated a deliberate indifference claim when denied "a Continuous Positive Air Pressure machine (CPAP) to use when sleeping").

Whether unlocked cell doors pose an unconstitutional risk to detainees, such that "potential victims dare[] not sleep" or risk attack if they do, is always a factual question dependent on the totality of the specific prison's circumstances and the prison officials' awareness of the risk. Hutto, 437 U.S. at 682 n.3. There is no sweeping constitutional rule that every cell in every prison must be locked as soon as the sun sets. Prison officials retain wide latitude to determine how best to

protect detainees from the risk of a nighttime assault. In this case, although the jail did not have cameras permitting visual monitoring, jail officials had several options to protect detainees overnight. The officials could remove violent inmates from the general population, leaving non-violent inmates and detainees to sleep in peace; conduct cell checks frequent enough to prevent nighttime assaults; lock every cell door to prevent violent inmates from leaving their cells and entering the cells of other detainees or coercing victims into the violent inmate's cell; rely on a combination of these methods; or perhaps develop a different approach not apparent from the record. What the officials could not do, without creating an unconstitutional safety risk, was nothing to assure detainees "safe conditions" of confinement. Youngberg v. Romeo, 457 U.S. 307, 315-16 (1982); see also, e.g., Spruce, 149 F.3d at 785 ("[P]rison officials have a duty to protect inmates from violence at the hands of other inmates." (citing Farmer, 511 U.S. at 833-34)).

Despite prison policies requiring frequent cell checks with nighttime lockdowns, Moore and his jailers actually did next to nothing. At night, cells were rarely checked and never locked. Bilinski's brief walkthroughs before the assault occurred at most every two hours, leaving dangerous inmates not only access through unlocked doors but also unmonitored accessibility for long stretches of the night. The risk was both obvious and known to prison officials, given Flennory's prior nighttime assault and Bilinski's first-hand observations of Walton's fear. Under the totality of the circumstances, failing to do anything to mitigate this risk—whether by locking doors, increasing cell checks, installing cameras, segregating violent prisoners, or some other approach—potentially fell below minimum constitutional standards. See, e.g., Farmer, 511 U.S. at 833-34; Youngberg, 457 U.S. at 315-16; Hutto, 437 U.S. at 682 n.3; Blackmon v. Lombardi, 527 F. App'x 583, 584-85 (8th Cir. 2013) (unpublished per curiam); Rollie v. Kemna, 124 F. App'x 471, 473-74 (8th Cir. 2005) (unpublished per curiam); Spruce, 149 F.3d at 785; Williams v. Mueller, 13 F.3d 1214, 1216 (8th Cir. 1994); Wade v. Haynes, 663 F.2d 778, 780-81 (8th Cir. 1981), aff'd sub nom. Smith v. Wade, 461 U.S. 30 (1983).

-13-

This case is analogous to Wade, where a non-violent inmate who, much like Walton, "was approximately 18 years old, five feet, eight inches tall and weighed approximately 130 pounds," was left in the same rarely monitored cell as a violent inmate, who "beat and sexually assaulted him." 663 F.2d at 780-81. A jury found the responsible correctional officer liable for compensatory and punitive damages, and, denying the officer's immunity request, we affirmed. See id. at 780-81, 786. Although Walton was not housed in the same cell as Flennory, leaving the cells unlocked and largely unmonitored overnight created essentially the same unsafe conditions as in Wade: a slight, non-violent youth was at the mercy of a strong, experienced, and violent predator. See id.

In other cases decided before the conduct at issue, we recognized that prison officials have an obligation, in a variety of circumstances, to protect non-violent inmates from violent inmates by keeping cell doors locked. In Irving v. Dormire, 519 F.3d 441, 447 (8th Cir. 2008), we affirmed the denial of qualified immunity to correctional officers who "failed to protect [an inmate] by opening the cell doors so that [another inmate] could attack him." To be sure, Irving involved intent by the officers to cause harm, which is not present here. See id. But the objective conduct—leaving a weak inmate in an unlocked cell at risk of attack—is the same as in this case. Indeed, in Newman v. Holmes, 122 F.3d 650, 651, 653 (8th Cir. 1997), we found sufficient evidence that a correctional officer violated the Eighth Amendment by simply unlocking the cell door of a violent inmate, who rushed out and committed an "unanticipated" attack against two other inmates.

Other circuits have reached similar results. For example, the Eleventh Circuit held two inmates "sufficiently allege[d] a constitutional violation by [the county responsible for the jail]" after they were assaulted by other inmates because "the locks on the doors to cells did not work," which "prevented the isolation of prisoners from each other and gave attackers ready access to" victims. Marsh v. Butler Cnty., Ala., 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc), abrogated on other grounds by Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007); see also, e.g.,

-14-

Pavlick v. Mifflin, 90 F.3d 205, 208-09 (7th Cir. 1996) (affirming judgment against prison guard who "knew he was exposing [an inmate] to a substantial risk of serious harm" by "opening [the] sleeping inmate's cell door"); Riley v. Jeffes, 777 F.2d 143, 146-47 (3d Cir. 1985) (finding inmate stated an Eighth Amendment claim based on allegations of violence occurring because "inmate cell doors were left open" and other inmates were "given keys," allowing "easy access to [the inmate's] cell while he [wa]s sleeping").

We emphasize Bilinski's and Moore's disregard for the prison's door-locking policy because that policy represents this jail's choice of how to protect detainees like Walton from nighttime assaults.[5]  "We must give substantial deference to prison officials to determine the best methods for dealing with dangerous inmates in the volatile environment that is prison life."  Norman v. Schuetzle, 585 F.3d 1097, 1105 (8th Cir. 2009).  Here, Sheriff Dawson determined the "best method[]" in this old jail, without cameras, was to lock the cell doors overnight, and he concluded that "[h]ad this policy been followed[,] it may have prevented this very serious incident."  "[W]hen prison administrators conclude that" locking the cell doors overnight is necessary to assure detainees' safety, "it would encroach upon the administrators' greater knowledge of prison conditions for us to hold *as a matter of law*" that leaving dangerous inmates in unlocked cells

---

[5]Contrary to the partial dissent's alarmist argument (accusing us of "impos[ing] a 'one-strike-you're-out' rule" that cell doors must be locked as soon as "an inmate . . . has committed one prior in-jail assault and his neighbor looks concerned"), post at 28, we express no view regarding this jail's choice among the wide variety of ways to protect detainees from nighttime attack.  We merely reiterate the officials' long-established obligation to implement some reasonable method (which might or might not include locking cell doors, installing cameras, or frequent walkthroughs) of protecting non-violent detainees housed in close proximity to violent inmates.  See, e.g., Farmer, 511 U.S. at 833-34; Youngberg, 457 U.S. at 315-16; Hutto, 437 U.S. at 682 & n.3; Spruce, 149 F.3d at 785; Wade, 663 F.2d at 780-81, 786.  The prison officials, not this court, chose a method—locking the jail doors—but  Moore and his jailers consciously failed to implement that method despite the obvious and known risks to detainee safety.

overnight "does not create a substantial risk that they will attack others." Newman, 122 F.3d at 652. Of course, violating an internal policy does not *ipso facto* violate the Constitution, but when that policy equates to the constitutional minimum under the totality of the circumstances, we appropriately focus on the objectively unconstitutional conduct which breaches the policy. See, e.g., Falls v. Nesbitt, 966 F.2d 375, 380 (8th Cir. 1992). Prison officials are not at liberty to violate the Constitution merely because doing so also happens to violate a prison policy. See Gardner v. Howard, 109 F.3d 427, 430-31 (8th Cir. 1997) (explaining liability attaches for the violation of a "constitutional right," regardless of any violation of "prison policy").

Writing for our court in Martin v. White, 742 F.2d 469, 470 (8th Cir. 1984), the late Judge Donald R. Ross called "the inability or unwillingness of some prison administrators to take the necessary steps to protect their prisoners from sexual and physical assaults by other inmates" "a national disgrace."[6] We must "not be hesitant to find a constitutional violation, if one exists." Id. at 473. One exists here if Walton's account is true. To be sure, a reasonable jury could reject Walton's view of the facts and accept Moore's testimony, but "[w]hich story is more plausible we cannot say because 'it is not our function to remove the credibility assessment from the jury.'" Atkinson v. City of Mountain View, Mo., 709 F.3d 1201, 1211 (8th Cir. 2013) (quoting Kukla v. Hulm, 310 F.3d 1046, 1050 (8th Cir. 2002)). At this stage, our role is simply to say a reasonable jury could find in Walton's favor.

---

[6]Similar to this case, Martin involved "defective cell locks [which] allowed violent inmates to freely enter other inmates' cells." 742 F.2d at 475. We reversed the trial court's directed verdict in favor of the prison superintendent, holding his failure to ensure minimally secure prison conditions "would clearly justify a jury in finding that he failed to reasonably respond to the risks of inmate assaults." Id. at 475-76.

-16-

### b. Bilinski's Underlying Failure to Protect Violation

Neither Moore's arguments nor the partial dissent's analysis alter our conclusion. Moore is right that unless his subordinate, Bilinski, "violated the Constitution," Moore cannot be liable "for failure to train," Carpenter v. Gage, 686 F.3d 644, 651 (8th Cir. 2012), but Moore is wrong that Bilinski must necessarily be joined as a defendant.[7] Although Walton has not sued Bilinski directly, having reviewed the record, we are satisfied Walton has enough evidence potentially to convince a jury that Bilinski committed the underlying failure to protect violation which gives rise to Moore's failure to train liability. Earlier, Bilinski noticed "Walton was used to pass [sic] his meal to Flennory's cell. . . . [I]t looked like more being a servant because somebody else told him to do that." It was also apparent to Bilinski that Walton was "scared." At 3:16 a.m., Bilinski saw both Walton and Flennory in Flennory's cell, and Walton was looking "very concerned."[8]

---

[7]Of course, Walton still bears the burden of convincing the jury that Bilinski committed the underlying failure to protect violation, and we expect the district court's eventual verdict form to require that antecedent finding before allowing the jury to impose any liability against Moore.

[8]At some point during the assault but before 4:00 a.m. (when Flennory penetrated Walton), Bilinski walked through the cell block. This must have been the 3:16 a.m. walkthrough because the next walkthrough was at 4:54 a.m.—by which time the assault was over. Bilinski's affidavit says he spoke to Walton at 3:16 a.m. but does not specify which cell Walton or Flennory were in at the time. Bilinski's report to Sheriff Dawson vaguely suggests Walton was alone in his own cell and claims "all inmates were secured." But Walton's testimony contradicts the former suggestion, and the latter statement by Bilinski is indisputably false—the cell doors were not locked. According to Walton's time line, during the 3:16 a.m. walkthrough both he and Flennory were in *Flennory's* cell. On interlocutory appeal, we must infer that at 3:16 a.m. (1) the assault was in progress, see Mo. Rev. Stat. § 566.010(1) (establishing the sexual assault began when Flennory first forcibly "fondled" Walton); (2) Walton and Flennory were in Flennory's cell; and (3) Bilinski observed enough to know Walton needed protection. See, e.g., Edwards v. Byrd, ___ F.3d ___, ___, No. 13-1560, 2014 WL 1622795, at *3 (8th Cir. April 24, 2014) ("[T]he guards vigorously dispute the facts that the district court found to be supported by the record. But we

-17-

Despite everything Bilinski had observed and the requirement that inmates be in their own cells at that hour of the night, Bilinski says he did nothing more than ask whether Walton was "all right." According to Bilinski, Walton "said he was fine," but Walton specifically denied this conversation in his response to the officials' statement of uncontroverted facts. Walton testified he and Bilinski *did not speak at all* during the 3:16 a.m. walkthrough. Crediting Walton's account, as we must on summary judgment, see Atkinson, 709 F.3d at 1210, we therefore infer Bilinski personally noticed disturbing circumstances that should have led a reasonable prison guard to act, yet Bilinski did nothing at the time. See, e.g., Odom v. S.C. Dep't of Corr., 349 F.3d 765, 773 (4th Cir. 2003) ("[A] correctional officer who stands by as a passive observer and takes no action whatsoever to intervene during an assault violates the rights of the victim inmate." (emphasis omitted)); Williams, 13 F.3d at 1216 ("A prison official acts with deliberate indifference to an inmate's safety when the official is present at the time of an assault and fails to intervene or otherwise act to end the assault.").

The partial dissent disagrees with this reasonable inference. Despite our obligation to view the facts in the light most favorable to Walton, the partial dissent insists Bilinksi was not required to intervene because "the facts of this case are less troubling than Holden," post at 26, 29 n.12. Cf. Tolan v. Cotton, 572 U.S. ___, ___, ___, No. 13-551, 2014 WL 1757856, at *1, *7 (May 5, 2014) (per curiam) (summarily vacating and remanding because "the Fifth Circuit failed to adhere to the axiom that in ruling on a motion for summary judgment, '[t]he evidence of the non[]movant is to be believed, and all justifiable inferences are to be drawn in his favor'" (alterations in original) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986))). Reading the record in the light most favorable to Walton, we cannot agree with the partial dissent. In Holden, the inmate plaintiff got into a fight with his cellmates and a prison official intervened almost immediately, stopping the fight "[a]pproximately *one minute* after [it] began." 663 F.3d at 339 (emphasis added). The Holden plaintiff's injuries were

_____

lack jurisdiction to field such factual arguments on interlocutory review.").

-18-

limited to "minor swelling," "some bruising, and a small cut and minor [lip] abrasion." Id. "There was no significant bleeding." Id. In this case, by contrast, Walton was threatened with death, sexually assaulted for over an hour without any intervention by prison officials, and left bleeding. "Short of homicide, [rape] is the ultimate violation of self." Coker v. Georgia, 433 U.S. 584, 597 (1977) (internal quotation omitted). Comparing a one-minute cellblock fight, which a prison official quickly stopped, with a one-hour sexual assault—involving death threats, forcible genital contact, and anal penetration—which a prison official failed to stop, we consider this case considerably more serious than Holden.

The partial dissent also places weight on Walton's failure to express fear, which is evidence a reasonable jury *could*, but need not, credit. See post at 26-27. Credibility is the province of the jury, and after observing live testimony, a reasonable jury could easily credit Walton's explanation that he was too afraid (given Flennory's death threats) to express fear or call for help. Our careful scrutiny of the record reveals this case is unlike Berry v. Sherman, 365 F.3d 631 (8th Cir. 2004), in that any evidence indicating "no one, including" Walton himself, "believed he was at 'substantial risk of serious harm,'" id. at 634 (quoting Jackson v. Everett, 140 F.3d 1149, 1151 (8th Cir. 1998)), is vigorously disputed. Apparently, the partial dissent disagrees with our view of the record in the light most favorable to Walton. See post at 26-27. "If three reasonable judges disagree about the facts contained in the record, surely the factual dispute is genuine enough to require resolution by a reasonable jury." Atkinson, 709 F.3d at 1212 n.5. This is especially true on an interlocutory appeal from the denial of qualified immunity, for we have no jurisdiction to supplant the district court's reasonable (i.e., not blatantly contradicted) interpretation of the factual record. See, e.g., Edwards, ___ F.3d at ___ & n.3, 2014 WL 1622795, at *3 & n.3.

### c.     Moore's Remaining Arguments

The rest of Moore's pleas for qualified immunity merit little attention. First, Moore's reliance on Ashcroft v. Iqbal, 556 U.S. 662 (2009), is misplaced because

Walton's claims are premised not on vicarious liability, but on Moore's personal knowledge of, and involvement in, unconstitutional acts. Second, Moore's contention that Walton has not shown Bilinski's training was constitutionally inadequate is nothing more than a factual dispute about the district court's view of the evidence in the light most favorable to Walton. Such factual disputes are not within our purview on interlocutory appeal. See Johnson, 515 U.S. at 313.

Third, Moore's argument that he lacked "notice of a pattern of unconstitutional acts committed by" his subordinates is similarly unavailing because it is based on a factual dispute outside our present jurisdiction. See Aaron, 624 F.3d at 884. If a jury credits Walton's evidence and finds Moore *actually knew* about his subordinate Bilinski's failure to lock the doors overnight and *actually knew* this failure posed a substantial risk, the jury will necessarily have concluded that Moore received sufficient notice of the constitutional risk. See Farmer, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways.").

Moore's erroneous reading of our decision in Norman, 585 F.3d at 1097, is impossible to square with the Supreme Court's decision in Farmer. Pointing to the fact that the attacker in Norman had five administrative arrests before the assault at issue in Norman, see id. at 1101, Moore would have us adopt a per se rule that a prison supervisor cannot be liable when one inmate attacks another, despite the supervisor's actual knowledge of the risk, until the attacker has assaulted more than five other inmates. Farmer's subjective standard, however, "imposes no such requirement."[9] Farmer, 511 U.S. at 849 n.10. Nor would such a requirement be consistent with the Eighth Amendment's "'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.'" Estelle v. Gamble, 429 U.S. 97, 102

---

[9]While a numerical notice limit arguably might prove decisive in the context of an objective failure to train claim under Canton, where a defendant may be liable for what he *should* have known, it adds no additional barrier to Farmer's stringent subjective standard, because a plaintiff must already prove the defendant supervisor *knew* of the substantial risk posed by the failure to train.

(1976) (quoting Jackson v. Bishop, 404 F.2d 571, 579 (8th Cir. 1968)); see also Butler, 465 F.3d at 344 (noting we "have repeatedly applied the deliberate indifference standard of Estelle to [Fourteenth Amendment] pretrial detainee claims"). Our decision in Norman was based, like this decision, on an individualized assessment of the particular prison official's subjective knowledge. See Norman, 585 F.3d at 1105-06. There was no evidence of personal knowledge in Norman. See id. Here there is.

For these reasons, we agree with the district court and conclude Moore is not entitled to qualified immunity at this stage of the case.

### 3. Sheriff Dawson

As to Sheriff Dawson's qualified immunity claim, we cannot agree with the district court's cursory analysis. The district court's only individualized scrutiny of Sheriff Dawson's entitlement to qualified immunity was a vague footnote declaring "fact questions remain with respect to whether [Sheriff] Dawson responded reasonably after the [other inmate's earlier] incident." The rest of the district court's order refers to the sheriff only in general terms, painting him with the same brush as Moore by assuming Sheriff Dawson (who had many responsibilities outside the prison) knew as much as Moore about the jail's day to day operations.

The doctrine of qualified immunity requires "an *individualized* analysis of *each* officer's alleged conduct." Roberts v. City of Omaha, 723 F.3d 966, 974 (8th Cir. 2013) (emphasis added). Even if the district court is right that Sheriff Dawson may not have responded reasonably to Flennory's earlier assault of another inmate, that factual question alone is an insufficient basis to deny qualified immunity under Farmer's subjective standard. It is not enough to say a factual question exists: the factual dispute must be both "genuine" and "material." Fed. R. Civ. P. 56(a). All of Walton's evidence on subjective knowledge relates only to Moore's knowledge, not Sheriff Dawson's. Contrary to the district court's wholesale pronouncement

-21-

that both officials must have known the risk, the undisputed evidence supports Sheriff Dawson's claim of qualified immunity. Sheriff Dawson's response to the sexual assault (expressing justified outrage, reprimanding Bilinski, and disciplining Moore) gives every indication that he, unlike Moore, did not know inmates like Walton were in jeopardy.

Having carefully reviewed the record in an effort to deduce what facts about Sheriff Dawson's own knowledge "the district court, in the light most favorable to the nonmoving party, likely assumed," Johnson, 515 U.S. at 319, we have found nothing but "speculation, conjecture, or fantasy" to rebut Sheriff Dawson's testimony that he did not know of the substantial risk posed by Moore's failure to train Bilinski, Schmidt v. City of Bella Villa, 557 F.3d 564, 571 (8th Cir. 2009). Because guesswork is not enough to reach a jury, we conclude Sheriff Dawson is entitled to qualified immunity. See id.

## III.  CONCLUSION

We affirm the denial of qualified immunity to Moore, reverse the denial of qualified immunity to Sheriff Dawson, and remand for further proceedings consistent with this opinion.

GRUENDER, Circuit Judge, concurring in part and dissenting in part.

I concur in the court's judgment reversing the denial of qualified immunity to Sheriff Dawson. However, I respectfully dissent from the judgment affirming the denial of qualified immunity to Moore.

Walton alleges that Moore is liable for failure to train under the Fourteenth Amendment. Without a showing that Moore's subordinate, Bilinski, violated the Constitution, however, Moore cannot be liable for failure to train. *See Carpenter v. Gage*, 686 F.3d 644, 651 (8th Cir. 2012). The court finds that Walton can prove

"that Bilinski committed the underlying failure to protect violation which gives rise to Moore's failure to train liability." *Ante* at 17. I disagree.

*Farmer v. Brennan*, 511 U.S. 825 (1994), requires Walton to establish that he faced "a substantial risk of serious harm" in order to prove that Bilinski violated the Constitution (as opposed to the jail's policy[10]) by failing to protect him. *Id.* at 834. Under *Farmer*, "the deprivation alleged must be, objectively, 'sufficiently serious.'" *Id.* (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). The court holds that Walton's sexual assault was "sufficiently serious to amount to a deprivation of constitutional dimension." *Ante* at 10 (quoting *Spruce v. Sargent*, 149 F.3d 783, 785 (8th Cir. 1998)). Undoubtedly, this attack left Walton "physically bloodied and emotionally bruised," *ante* at 2, and prison rape is a serious problem, Just Detention International, *The Basics About Sexual Abuse in U.S. Detention*, http://www.justdetention.org/en/factsheets/basics_fact_sheet_final. pdf (last visited May 7, 2014). "It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for

---

[10]The court focuses at length upon Bilinski's failure to comply with the jail's nighttime cell-lock policy, concluding that the noncompliance was "an obvious, substantial risk to inmate safety." *Ante* at 10 (quoting *Farmer*, 511 U.S. at 843). However, a "sheriff's or his subordinates' alleged violation of jail policies does not result in section 1983 liability." *Bailey v. Schmidt*, 239 F. App'x 306, 308 (8th Cir. 2007) (per curiam) (citing *Gardner v. Howard*, 109 F.3d 427, 430-31 (8th Cir. 1997)); *see also Hocker v. Pikeville City Police Dep't*, 738 F.3d 150, 154, 156 (6th Cir. 2013) (holding that in a § 1983 action against a law enforcement officer, the relevant inquiry is whether the officer violated the Constitution, not whether the officer violated a department policy). The court itself concedes that "violating an internal policy does not *ipso facto* violate the Constitution." *Ante* at 16. Indeed, in an analogous case brought under the Eighth Amendment, we clarified that "a prison official's violation of an internal regulation does not give rise to an Eighth Amendment claim of 'cruel and unusual punishment,' in the absence of" a constitutional violation. *Falls v. Nesbitt*, 966 F.2d 375, 380 (8th Cir. 1992). In other words, Bilinski's failure to comply with the jail's nighttime cell-lock policy results in § 1983 liability only if it can be shown that Bilinski failed to protect Walton within the meaning of *Farmer*.

prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. Indeed, *Farmer* establishes that even serious harms—including sexual assault—do not give rise to § 1983 liability unless the inmate demonstrates that the assault occurred while he was "incarcerated under conditions that posed a substantial risk that he would be sexually assaulted." *Spruce*, 149 F.3d at 785-86; *see also Irving v. Dormire*, 519 F.3d 441, 447 (8th Cir. 2008) ("To prove a sufficiently serious deprivation in failure to protect claims, an inmate must prove that prison officials caused him to be incarcerated under conditions posing a substantial risk of serious harm.") (internal quotation marks and citation omitted). The court concludes that "leaving the cells unlocked overnight" created "an obvious, substantial risk to inmate safety," *ante* at 10—linking the unlocked cells to an alleged constitutional right to "sleep without legitimate fear of a nighttime assault by another detainee," *ante* at 12. However, there was no evidence of any generalized substantial risk of harm from assault by other inmates at night.

Properly framed, the question is whether Flennory—who had a single prior in-jail assault and who was housed in an adjacent unlocked cell—posed a substantial risk of assaulting a fellow inmate. The court eventually reaches the correct question but concludes, with little analysis, that the risk posed by Flennory in an unlocked cell was "obvious" because of Flennory's single prior nighttime assault and Bilinski's observation of Walton's "very concerned" expression. *Ante* at 13, 17. "[F]ailing to do anything to mitigate this risk," the court suggests, "potentially fell below minimum constitutional standards." *Ante* at 13. For the following reasons, I disagree, concluding instead that Walton was not "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834.

In measuring whether an inmate faced a substantial risk of serious harm under *Farmer*, "the assailant's conduct can provide the court 'the most probative evidence of the degree and type of risk that [the inmate] faced.'" *Nelson v. Shuffman*, 603 F.3d 439, 447 (8th Cir. 2010) (alteration in original) (quoting *Young*

-24-

*v. Selk*, 508 F.3d 868, 872 (8th Cir. 2007)). Accordingly, it is worth recounting some details about Flennory's history at the Macon County Jail. It is undisputed that Flennory was housed in the jail's general population without incident for 373 days spread over a fifteen-year period—the most recent being the 247 days from September 25, 2009, to May 29, 2010. On May 30, 2010, Flennory assaulted another inmate. The May 30 incident did not involve anal rape; rather, Flennory bit the inmate's groin through his pants and reached down the back of his pants. Flennory spent the next two months segregated from the general population as a result of this infraction.

However, "[p]risons are not required to segregate indefinitely all inmates whose original crimes suggest they might be capable of further violence[, and t]he same is true for inmates who engage in violence while in prison." *Norman v. Schuetzle*, 585 F.3d 1097, 1105 (8th Cir. 2009) (internal citations and quotation marks omitted). We have afforded "substantial deference to prison officials to determine the best methods for dealing with dangerous inmates in the volatile environment that is prison life"—presumably including whether an inmate must remain in segregation. *Holden v. Hirner*, 663 F.3d 336, 342 (8th Cir. 2011) (quoting *Norman*, 585 F.3d at 1105). Before being returned to the general population, Flennory was told that any future infractions would result in his being returned to segregation. Flennory stated that he understood and agreed to behave. When Flennory returned to the general population at the beginning of August 2010, he behaved well, even though, according to Bilinski, the cell doors remained unlocked. The record contains no evidence of misbehavior by Flennory for the entire month of August until the assault against Walton on August 30. For the five days Walton and Flennory were housed beside each other, from August 25 until August 30, Flennory was friendly toward Walton, playing cards with him—even on the night before and morning of the assault.

Compared to other cases in which we discerned a substantial risk of serious harm, Flennory's pre-incident conduct while incarcerated is considerably less

disturbing. For example, in *Nelson*, we held that an inmate posed a substantial risk of serious harm where he previously had sexually assaulted two males, "demanded sex from a former roommate and solicited sex from other residents," "subjected staff and residents to a relentless barrage of physical and sexual threats, assaultive and sexually explicit behavior, and related violent and aggressive misconduct." 603 F.3d at 447; *see also Spruce*, 149 F.3d at 785-86 (finding a substantial risk of serious harm where the plaintiff alleged that he was raped by more than twenty different inmates in a prison where the warden acknowledged a culture requiring inmates to fight against sexual aggressors). Unlike the repeatedly assaultive inmate in *Nelson* and the pervasive rape culture in *Spruce*, Flennory was involved in only *one* prior incident while incarcerated. That incident occurred on May 30—three months before the August 30 assault on Walton—and involved behavior substantially less disturbing than his attack on Walton.

In addition, the facts of this case are less troubling than *Holden*, in which we found no substantial risk of serious harm. Identified as a vulnerable detainee, Holden was housed in protective custody with three cellmates. 663 F.3d at 339. His cellmates injured him in a fight in the cell. *Id.* Only four days before the fight, one of his cellmates had been involved in a fight with another detainee. *Id.* at 341. Yet we discerned no substantial risk of serious harm, because Holden was housed in protective custody "designed to provide greater supervision and security for inmates more likely to be assaulted." *Id.* We arrived at this conclusion despite Holden, marked as a vulnerable detainee, being housed in the same cell as an inmate who had fought another detainee just four days earlier. By comparison, Flennory's single prior incident took place a full *three months* before his attack on Walton. Therefore, I conclude that Flennory's comparatively limited assaultive history at the jail is probative evidence that Walton did not face a substantial risk of serious harm.

Additionally, Walton's "failure to express fear . . . [is] some evidence that a substantial risk of serious harm did not exist." *Young*, 508 F.3d at 872. Walton

-26-

admits that he never told Bilinski, Moore, or any jail staff that Flennory had threatened him in any manner or that he had any other reason to fear Flennory. In fact, Walton consciously chose not to express fear regarding Flennory's presence or conduct. On the day before the attack, Flennory indicated in a note to Walton that he intended to fellate him. However, Walton decided not to tell anyone about the note, instead flushing it down his cell toilet because he "didn't take it serious[ly] at the time." We have found no substantial risk of serious harm in an analogous case where the plaintiff, like Walton, failed to express fear. In *Berry v. Sherman*, 365 F.3d 631 (8th Cir. 2004), the plaintiff shared a cell with an inmate who reportedly possessed a knife. *Id.* at 633. Although Berry eventually was attacked by his cellmate and two other inmates with a knife, we held that Berry failed to demonstrate a substantial risk of serious harm because Berry did not express fear for his safety prior to being attacked, despite knowing that his cellmate was reported to possess a knife. *Id.* The court attempts to distinguish *Berry* by observing that, unlike Berry, Walton testified he did not say anything, because Flennory had threatened to kill him if he spoke to jail staff. *Ante* at 20. This distinction, however, is not responsive to Walton's failure to express fear when he received Flennory's fellatio note. To be clear, Walton's failure to report the note to jail staff had nothing to do with being afraid of Flennory. Rather, Walton repeatedly testified that he simply "didn't take it serious[ly]." Walton also admits that he failed to express fear verbally during Bilinski's walkthrough the morning of the attack when Walton knew "or should strongly [have] suspect[ed] that Mr. Flennory [wa]s going to want to have anal sex with" him. Although Bilinski noticed that Walton looked concerned during the walkthrough, I cannot agree that this look of concern, even combined with Flennory's single prior assault, constituted a condition of incarceration posing a substantial risk of serious harm—particularly in light of Flennory's positive history with Walton during which they played cards together and never engaged in violence. Accordingly, I consider Walton's failure to express fear to be probative evidence that a substantial risk of serious harm did not exist.

-27-

The court claims that this decision does not create a "sweeping constitutional rule that every cell in every prison must be locked as soon as the sun sets." *Ante* at 12. This caveat rings hollow. The court's ruling will apply if a cell contains an inmate who has committed a single assault while incarcerated and his neighbor looks concerned, even if the inmate has spent substantial time in segregation as punishment, has agreed to behave, and has behaved for a month. The court essentially imposes a "one-strike-you're-out" rule—*i.e.*, an inmate necessarily poses a substantial risk of serious harm if he has committed one prior in-jail assault and his neighbor looks concerned, and a jail is deliberately indifferent if it does not implement one or more of the court's recommended security measures in response. Indeed, the court suggests that the Macon County Jail had to continue to "remove [Flennory] from the general population," "lock every cell door,"[11] "conduct cell

---

[11]The court suggests that we have imposed a cell-lock requirement in the past under similar circumstances, citing *Wade v. Haynes*, 663 F.2d 778 (8th Cir. 1981), and *Newman v. Holmes*, 122 F.3d 650 (8th Cir. 1997). *Ante* at 14. Those cases are distinguishable given that the assailants in both *Wade* and *Newman* were housed in isolated confinement at the time of the attacks due to their known present dangerousness. *Wade*, 663 F.2d at 781; *Newman*, 122 F.3d at 651. Here, at the time of the attack, Flennory was housed in the general population, had not demonstrated any behavioral problems in the month following his return from segregation, and even played cards with Walton. Leaving Flennory's door unlocked in the general population is not tantamount to leaving unlocked the doors of inmates in isolated confinement. The court also cites *Irving v. Dormire*, 519 F.3d 441 (8th Cir. 2008), *Pavlick v. Mifflin*, 90 F.3d 205 (7th Cir. 1996), and *Riley v. Jeffes*, 777 F.2d 143 (3d Cir. 1985). *Ante* at 14-15. Those cases also are distinguishable given that the guards in those cases, unlike Bilinski, intentionally opened the victims' cell doors or gave inmates keys to allow access to other inmates' cells knowing their actions would cause harm. *Irving*, 519 F.3d at 447; *Pavlick*, 90 F.3d at 208-09; *Riley*, 777 F.2d at 146-47. Finally, the court cites *Marsh v. Butler County, Ala.*, 268 F.3d 1014 (11th Cir. 2001) (en banc). *Ante* at 14. In *Marsh*, the institution was "so dilapidated that inmates could fashion weapons from pieces of the building." *Id.* at 1027. Unlike this case, "conditions in a jail facility that allow prisoners ready access to weapons" contributed to a finding that a substantial risk of serious harm existed. *Id.* at 1028. No such condition of confinement was alleged in this case.

-28-

checks frequent[ly] enough to prevent nighttime assaults,"[12] "rely on a combination of these methods," "or . . . develop a different approach not apparent from the record." *Ante* at 13. This simply cannot be. Incarcerating institutions must be able to determine, without fearing liability, that an offending inmate can be housed in community with other inmates without permanent locks or infallible monitoring after the inmate has been sufficiently punished and apparently reformed (*e.g.*, as here, through substantial segregation, conversation with jail staff, and a month of demonstrated good behavior). The court forgets that "[a]n unfortunate by-product of our prison system is the incidence of violence between inmates," and that "[w]hile unfortunate, all such incidents of violence do not violate" the Constitution. *Falls v. Nesbitt*, 966 F.2d 375, 380 (8th Cir. 1992); *see also Andrews v. Siegel*, 929 F.2d 1326, 1330-31 (8th Cir. 1991) ("[S]ome violence in prisons may be unavoidable due to the character of the prisoners.") (ellipsis omitted) (quoting *Martin v. White*, 742 F.2d 469, 475 (8th Cir. 1984)).

Accordingly, I conclude that Walton was not incarcerated under conditions that, measured objectively and without the benefit of hindsight, posed a substantial risk of serious harm. This necessarily means that Bilinski did not fail to protect Walton. *Berry*, 365 F.3d at 635 (holding that where evidence does not establish that plaintiff "objectively faced a substantial risk of harm," the plaintiff's failure-to-protect claim fails). It follows that Moore is entitled to qualified immunity. *See Carpenter*, 686 F.3d at 651. For these reasons, I respectfully dissent from the judgment affirming the denial of qualified immunity to Moore.

_____

[12]Nor have we required cell monitoring with sufficient frequency such that the monitoring is necessarily efficacious. Jails and prisons are *not* subject to strict liability under the Constitution. Again, I turn to *Holden* as an example. In that case, the plaintiff was housed in the same cell as an inmate who had violently fought another inmate only four days before his attack on the plaintiff. However, we found no substantial risk of serious harm, because the inmate was housed in protective custody with greater supervision and security—even though that increased monitoring evidently was not frequent enough to prevent the harm.

-29-