# United States Court of Appeals

## For the Eighth Circuit

_____

No. 14-3889

_____

James Saylor

*Plaintiff - Appellee*

v.

State of Nebraska

*Defendant*

Randy Kohl, M.D.; Dennis Bakewell; Robert Houston

*Defendants - Appellants*

Nebraska Department of Correctional Services; Natalie Baker, M.D.; Mohammad Kamal, M.D.

*Defendant*s

Cameron White, PhD.; Mark Weilage, PhD.; Fred Britten; Kari Perez, PhD.

*Defendants - Appellants*

Correct Care Solutions, LLC.

*Defendant*

_____

Appeal from United States District Court
for the District of Nebraska - Lincoln

_____

_____

Before RILEY, Chief Judge, BEAM and KELLY, Circuit Judges.

_____

BEAM, Circuit Judge.

James Saylor sued the State of Nebraska, the Nebraska Department of Correctional Services (NDCS), Dr. Randy Kohl, Dennis Bakewell, Robert Houston, Dr. Natalie Baker, Dr. Mohammad Kamal, Dr. Cameron White, Dr. Mark Weilage, Fred Britten, Dr. Kari Perez, and Correct Care Solutions, LLC, (collectively "Defendants") under 42 U.S.C. § 1983 alleging violations of his rights under the First, Eighth, and Fourteenth Amendments of the United States Constitution. Defendants filed a motion to dismiss, and the district court dismissed Saylor's claims against the State of Nebraska and NDCS, as well as claims for monetary relief against individual defendants in their official capacities. The remaining defendants then moved for summary judgment on the basis of qualified immunity. The district court denied the motion. We reverse.

## I.    BACKGROUND

Saylor is a Nebraska inmate convicted of second-degree murder. Dr. Kohl is the Medical Services Director for NDCS. Other medical defendants include Dr. White, Dr. Weilage, and Dr. Perez.[1] The nonmedical defendants include Houston,

_____

[1]Dr. Natalie Baker, Dr. Mohammad Kamal, and Correct Care Solutions do not appeal the district court's order.

Warden Britten, and Warden Bakewell.[2]  In 2002, while a prisoner at the Nebraska State Penitentiary (NSP), Saylor was allegedly attacked, beaten, and raped by other inmates.  In 2005 Saylor was diagnosed with Post-Traumatic Stress Disorder (PTSD) as a result of the 2002 attack, and he began seeing Dr. Glen Christensen, a psychiatrist who contracted with NDCS.  Saylor saw Dr. Christensen monthly for treatment.  In April 2005, Saylor filed a complaint in state court alleging that the State of Nebraska and NDCS failed to protect him from the assault and failed to properly treat him after the assault.  The trial was held in 2009, and in 2010 the state court entered an order in favor of Saylor, finding that the staff was negligent in failing to provide him with reasonably adequate protection from the 2002 assault.  The court also found that Saylor received inadequate medical treatment from Dr. Kamal from 2002 to 2005.  Saylor was awarded $250,000 in damages.

In April 2010, Saylor had his last meeting with Dr. Christensen because his contract with the prison was ending in May 2010.  In addition, Saylor had monthly Mental Status Reviews with Cathy Moss, a Licensed Mental Health Practitioner.  She informed Saylor that Dr. Kamal was the only psychiatrist available to work with him at NSP.  In May 2010, Saylor stated that he would not work with Dr. Kamal because Dr. Kohl had removed Dr. Kamal as Saylor's psychiatrist five years ago.  Thus, Saylor agreed to forgo psychiatric care but wanted to continue taking his medications.  A multidisciplinary hearing was held in 2010 to discuss the next step for Saylor because Dr. Christensen's contract ended and Saylor refused to work with Dr. Kamal.  Defendants Dr. Weilage, Dr. Perez, and Dr. Kamal participated in the meeting, along with others not named in the lawsuit.  The group suggested that Saylor could be transferred to Tecumseh State Correctional Institution (TSCI) because Dr. Baker, a psychiatrist providing care at TSCI, could work with Saylor.  It is normal procedure

---

[2]At the time of the events leading up to this lawsuit, Fred Britten was the warden of TSCI and Robert Houston was the warden of NSP.

-3-

for a correctional facility to transfer inmates who need mental health care beyond the resources available in their facility to a facility where such care is available. Warden Bakewell made the final decision, and Saylor was transferred to TSCI in September 2010. Saylor claims that the transfer was unnecessary, retaliatory, and caused his PTSD to worsen.

Saylor was initially classified as an inmate in Protective Custody[3] but was placed in the TSCI hospital upon arrival because he attempted to hang himself before he was transferred. While in the hospital he met with Dr. Baker. Dr. Baker wanted to gradually take Saylor off Seroquel, one of his medicines. He agreed and decided to continue taking Xanax. Throughout his time at TSCI, Saylor saw Dr. Baker every couple of months and was subjected to monthly Mental Status Reviews, but he often refused to participate. After a week in the hospital, Saylor was placed in the Special Management Unit (SMU) for refusing to move to Protective Custody. SMU is the only facility with single cells, and Saylor specifically asked for his own cell because of his PTSD and fear of roommates. In early October 2010, he was moved to Protective Custody, which houses two inmates per cell. In late October 2010, he was placed on immediate segregation again and housed in SMU because he feared for his safety. Thereafter, in the normal course, Saylor's classification was reviewed every four months per policy and procedure, and he was allowed to attend each hearing. As a result of these reviews, TSCI concluded that Saylor could be released into Protective Custody, but he rejected that proposal each time due to his fear of

---

[3]When an inmate arrives at TSCI, he is classified. Classifications include "[d]emotion to, continuation of and promotion from all custody grades;" "unit, work and program assignment;" and "[a]ssignment to, continuation of and removal from Administrative Segregation." "Administrative Segregation includes: Administrative Confinement, Intensive Management, Protective Custody, and Transition Confinement." Every four months the prison conducts a review of inmates in Administrative Segregation.

roommates. Therefore, Saylor remained in SMU for the duration of his time at TSCI.

Saylor brought suit against Dr. Kohl and the other named Defendants under 42 U.S.C. § 1983. He claims that Defendants retaliated against him in violation of the First Amendment by transferring him to TSCI and reclassifying him, that the transfer and classification review process violated his due process rights under the Fourteenth Amendment, and that Defendants were deliberately indifferent to his PTSD in violation of the Eighth Amendment. Defendants filed a motion to dismiss, and the district court dismissed the State of Nebraska and NDCS from the case, and denied monetary relief against individual defendants in their official capacities. The remaining defendants then moved for summary judgment based on qualified immunity. The district court stated that "[t]he constitutional right at issue arises under the Eighth Amendment," and thus, did not directly discuss Saylor's First or Fourteenth Amendment claims. On the Eighth Amendment claim, however, the court held, "[T]here are genuine issues of material fact on whether the defendants were deliberately indifferent to his serious medical needs so as to violate the Eighth Amendment." Thus, the court held that summary judgment was inappropriate and denied qualified immunity. In this interlocutory appeal Defendants challenge the district court's denial of summary judgment based on qualified immunity.

## II.  DISCUSSION

"Faced with an interlocutory appeal from the denial of qualified immunity, we accept as true the district court's findings of fact to the extent they are not 'blatantly contradicted by the record,' and review the district court's conclusions of law de novo." Walton v. Dawson, 752 F.3d 1109, 1116 (8th Cir. 2014) (quoting Scott v. Harris, 550 U.S. 372, 380 (2007)). Summary judgment is only proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Turney v. Waterbury, 375 F.3d 756, 759 (8th Cir. 2004). Generally, summary

judgment based on qualified immunity is a legal question. Id. at 760. However, "[i]f the district court fails to make a factual finding on an issue relevant to our purely legal review, we 'determine what facts the district court, in the light most favorable to the nonmoving party, *likely* assumed.'" Walton, 752 F.3d at 1116 (quoting Johnson v. Jones, 515 U.S. 304, 319 (1995)). If this is impossible, summary judgment is improper, and the case must be remanded. Id. at 1117.

"Government officials performing discretionary functions are entitled to qualified immunity unless they violate clearly established statutory or constitutional rights of which a reasonable person would have known." Whisman v. Rinehart, 119 F.3d 1303, 1309 (8th Cir. 1997). As in this case, qualified immunity is usually raised in a motion for summary judgment as an affirmative defense to the claims. Id. "To overcome the defense of qualified immunity, a plaintiff must show: (1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." Howard v. Kan. City Police Dep't, 570 F.3d 984, 988 (8th Cir. 2009).

Whether there has been a deprivation of a constitutional right is a fact-intensive analysis. The meaning of "clearly established," however, has been litigated extensively and given a more definite meaning. The Eighth Circuit and the Supreme Court have held that a right is clearly established if "the 'contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Buckley v. Rogerson, 133 F.3d 1125, 1128 (8th Cir. 1998) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). This is so that an "official is not required to guess the direction of future legal decisions." Id. Essentially, the law must be certain enough to give a "fair and clear warning." United States v. Lanier, 520 U.S. 259, 271 (1997). If a plaintiff can show relevant case law in the jurisdiction at the time of the incident that should have put the government

employee on notice, qualified immunity is improper. See Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2086 (2011) (Kennedy, J., concurring).

## A.     Eighth Amendment Claim

Saylor "alleges that the defendants were deliberately indifferent to his serious medical needs in failing to properly treat him for [PTSD]." Here, Saylor essentially claims that his level of care after Dr. Christensen left NSP was so low as to constitute cruel and unusual punishment. The district court concluded that Defendants were not entitled to summary judgment based on qualified immunity for this claim because "[t]here are genuine disputes concerning the predicate facts material to the qualified immunity issue."[4] Defendants argue that this decision was in error. After reviewing the facts determined by the district court, as well as those likely assumed, we agree.

"The Eighth Amendment 'prohibits the infliction of cruel and unusual punishments on those convicted of crimes.'" Nelson v. Corr. Med. Servs., 583 F.3d 522, 528 (8th Cir. 2009) (quoting Wilson v. Seiter, 501 U.S. 294, 296-97 (1991)). In

---

[4]Although we do not have jurisdiction "at this juncture to decide whether 'the district court's determination of evidentiary sufficiency' was correct," Walton, 752 F.3d at 1116 (quoting Thomas v. Talley, 251 F.3d 743, 747 (8th Cir. 2001)),

> we [do] have jurisdiction to decide, viewing the facts in the light most favorable to [the] plaintiff[], whether a reasonable fact-finder could find a violation of plaintiff['s] rights, whether the law establishing the violation was clearly established at the time in question, what was known to a person who might be shielded by qualified immunity, and the reasonableness of defendant[s'] actions.

S.M. v. Krigbaum, 808 F.3d 335, 340 (8th Cir. 2015). Here, we decide the "purely legal matter" of whether "the denial [of qualified immunity] was erroneous." Payne v. Britten, 749 F.3d 697, 700 (8th Cir. 2014).

regards to prison conditions, confinement, and medical care while in prison, "the constitutional question . . . is whether [Defendants] acted with 'deliberate indifference.'" Id. (quoting Wilson, 501 U.S. at 303). "A prison official is deliberately indifferent if she 'knows of and disregards' a serious medical need or a substantial risk to an inmate's health or safety." Id. (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). The deliberate indifference standard has both objective and subjective prongs. Id. at 529. The plaintiff must prove "that he suffered from an objectively serious medical need" and "that [Defendants] actually knew of but deliberately disregarded his serious medical need." Scott v. Benson, 742 F.3d 335, 340 (8th Cir. 2014). A medical condition is "objectively serious" if the prisoner was diagnosed by a doctor or it is so obvious that a lay person would recognize the medical need. Id. It is not contested that Saylor had a serious medical need; Dr. Christensen diagnosed Saylor with PTSD in 2005. Here, the subjective prong is the main issue. The subjective prong of deliberate indifference is an extremely high standard that requires a mental state of "more . . . than gross negligence." Fourte v. Faulkner Cty., Ark., 746 F.3d 384, 387 (8th Cir. 2014) (quoting Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000)). It "requires a mental state 'akin to criminal recklessness.'" Jackson v. Buckman, 756 F.3d 1060, 1065 (8th Cir. 2004) (quoting Scott, 742 F.3d at 340). Even medical malpractice does not automatically constitute deliberate indifference. Id. at 1065-66.

For Houston, Britten, and Bakewell, the nonmedical defendants in this case, Saylor "must allege and show that the supervisor personally participated in or had direct responsibility for the alleged violations" or "that the supervisor actually knew of, and was deliberately indifferent to or tacitly authorized, the unconstitutional acts." McDowell v. Jones, 990 F.2d 433, 435 (8th Cir. 1993). They must have also had a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834 (quoting Wilson, 501 U.S. at 297). Saylor provides no specific evidence to show that any of the nonmedical defendants were involved in, or directly responsible for, his allegedly

insufficient medical care.[5]   These defendants did not even participate in the multidisciplinary meeting regarding Saylor's transfer.  Thus, because they did not have "a reason to believe (or actual knowledge) that prison doctors or their assistants [were] mistreating (or not treating) [Saylor]," they cannot be held liable for cruel and unusual punishment in violation of the Eighth Amendment.  Hayes v. Snyder, 546 F.3d 516, 527 (7th Cir. 2008) (quoting Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004)).

As for the named medical defendants, Dr. Kohl, Dr. White, Dr. Weilage, and Dr. Perez, none were treating physicians.  Thus, these defendants also acted in a supervisory capacity.  "To impose supervisory liability, other misconduct [by the medical defendants] must be very similar to the conduct giving rise to liability." Livers v. Schenck, 700 F.3d 340, 356 (8th Cir. 2012).  This means that there is no real vicarious liability.  See McDowell, 990 F.2d at 435.  Rather, to be liable under § 1983 the medical defendants had to personally violate Saylor's rights or be responsible for a systematic condition that violates the Constitution.  Livers, 700 F.3d at 357. Saylor's main argument is that the treatment that occurred after Dr. Christensen left NSP rises to the level of cruel and unusual punishment.  Dr. Christensen's treatment plan was three-part: regular psychotherapy treatment, medication, and a safe environment.  The medical defendants attempted to provide Saylor with another psychiatrist at NSP, ultimately found him another psychiatrist at TSCI, continued

---

[5]Saylor generally states in his complaint that "Defendants Bakewell, Britten and Houston are equally responsible participants in the Plaintiff's transfer, and any reduction in health care services to the Plaintiff [that] resulted from such transfer." Without any specifics, Saylor claims that the nonmedical defendants "continually exposed [him] to intolerable, horrifying, and medically detrimental conditions while he [was] housed at TSCI since 2010."  These indiscriminate grievances are not enough to prove that they knew of, participated in, or implicitly authorized, the mistreatment or nontreatment of Saylor, such as is necessary to maintain a claim of deliberate indifference under the Eighth Amendment.

medication as they saw fit within their independent medical judgment, and gave him his requested private cell. To the extent there was any change in Dr. Christensen's treatment plan, Saylor requested some and agreed to other deviations. Specifically, Saylor stated he was willing to forgo seeing a doctor so long as he could continue taking his medications. After the meeting with Dr. Baker wherein she suggested easing him off Seroquel because it did not seem to be helping and was causing low blood pressure, Saylor agreed to continue taking Xanax.

Throughout his time of incarceration, the record shows that Defendants met Saylor's medical needs beyond the minimum standard required. Defendants were aware of his medical needs and took steps to meet those needs. Because Saylor cannot show that Defendants acted with deliberate indifference, there was no deprivation of his Eighth Amendment rights, and thus, Defendants are entitled to qualified immunity.

### B. First and Fourteenth Amendment Claims

Defendants claim that the district court erred by failing to fully discuss the denial of summary judgment based on qualified immunity with regard to these claims. "It is 'certain, and the case law is clear, that [the officials] are entitled to a *thorough determination* of their claim[s] of qualified immunity if that immunity is to mean anything at all.'" Payne, 749 F.3d at 701 (first and third alteration in original) (emphasis added) (quoting O'Neil v. City of Iowa City, Iowa, 496 F.3d 915, 917 (8th Cir. 2007)). A thorough determination discusses all of the claims litigated. Here, the court denied qualified immunity by generally denying Defendants' motion for summary judgment but only analyzed the Eighth Amendment claim. Nonetheless, a review of the facts determined by the district court, as well as those likely assumed, reveals no violation of either the First or Fourteenth Amendment, and thus, we reverse and dismiss these claims as well.

Saylor claims that in retaliation against him for filing the state tort case and in violation of the First Amendment, Defendants (1) terminated Dr. Christensen so that Saylor no longer received adequate psychiatric care, (2) discontinued his medicines, (3) refused to provide him with psychotherapy, (4) transferred him to a new facility, and (5) kept him isolated in Administrative Segregation without review. Similarly, Saylor's Fourteenth Amendment substantive due process claim arises due to his transfer to TSCI and his subsequent confinement in SMU.

In order to succeed on a First Amendment retaliation claim Saylor must show that "(1) he engaged in a protected activity, (2) the government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity, and (3) the adverse action was motivated at least in part by the exercise of the protected activity." Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir. 2004). The *reason* for the government official's action must have been to prevent the plaintiff from engaging in the protected activity. Id.

First, "inmates have no constitutional right to receive a particular or requested course of treatment, and prison doctors remain free to exercise their independent medical judgment." Meuir v. Greene Cty. Jail Emps., 487 F.3d 1115, 1118 (8th Cir. 2007) (quoting Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997)). As such, Defendants violated no constitutional right by assigning Saylor to another psychiatrist when Dr. Christensen's contract with NDCS ended or by changing Saylor's medication at the direction of a doctor. Second, "a prisoner enjoys no constitutional right to remain in a particular institution." Goff v. Burton, 7 F.3d 734, 737 (8th Cir. 1993) (quoting Murphy v. Mo. Dep't of Corr., 769 F.2d 502, 503 (8th Cir. 1985)). In fact, "prison officials 'may transfer a prisoner for whatever reason or for no reason at all.'" Id. (quoting Olim v. Wakinekona, 461 U.S. 238, 250 (1983)). However, retaliation against a prisoner cannot be the motivation behind the transfer. Id. Here, the clearly stated, nonretaliatory reason for the transfer was to provide Saylor with

-11-

necessary psychiatric care. He refused to see Dr. Kamal at NSP, and Dr. Baker was available to work with Saylor at TSCI. Finally, Saylor was kept in Administrative Segregation, specifically SMU, because he requested his own cell due to his PTSD. This is the only area with single prisoner cells. Although he was cleared to be released into Protective Custody, he would have had to share a cell with a roommate, which he refused to do. It is blatantly contradictory to request a private cell with no roommates and then complain about isolation. Because none of Saylor's activities were protected and none of Defendants' actions were retaliatory, Saylor has no First Amendment claim.

"The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property." Wilkinson v. Austin, 545 U.S. 209, 221 (2005). To state a claim under the Due Process Clause, some interest must first be violated. See Singleton v. Cecil, 176 F.3d 419, 424 (8th Cir. 1999). "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." Wilkinson, 545 U.S. at 221. In most cases, substantive due process violations involve "marriage, family, procreation, and the right to bodily integrity." Singleton, 176 F.3d at 425 (quoting Albright v. Oliver, 510 U.S. 266, 272 (1994)). More generally, the Supreme Court has held that substantive due process "protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition,' and 'implicit in the concept of ordered liberty.'" Id. (quoting Washington v. Glucksberg, 521 U.S. 702, 721 (1997)).

In regards to Saylor's transfer from NSP to TSCI:

the Due Process Clause in and of itself [does not] protect a duly convicted prisoner against transfer from one institution to another within the state prison system. Confinement in any of the State's institutions is

-12-

within the normal limits or range of custody which the conviction has authorized the State to impose.

Meachum v. Fano, 427 U.S. 215, 225 (1976). Here, Saylor was transferred to a comparable prison for the sole purpose of obtaining psychiatric care. This does not violate the Due Process Clause of the Fourteenth Amendment, and neither does Saylor's confinement in SMU once he arrived at TSCI. Saylor only has a claim under the Fourteenth Amendment if the action by the government officials "impose[d] atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). Segregation due to a prisoner's request to be kept in a single prisoner cell because of PTSD is not an atypical or a significant hardship. Rather, TSCI made special accommodations for Saylor. Accordingly, there has been no constitutional violation, and thus, Saylor has no cognizable Fourteenth Amendment claim. Defendants are entitled to qualified immunity on these two issues.

## III. CONCLUSION

The judgment of the district court is reversed, and the case is dismissed.

KELLY, Circuit Judge, dissenting.

The district court found that the evidence in this case, viewed in the light most favorable to Saylor, demonstrated a genuine dispute as to the facts relevant to qualified immunity. I agree with the district court that the evidence presented by Saylor, though not dispositive as to the merits of his claim, precludes summary judgment on the basis of qualified immunity.

In Saylor's previous state tort lawsuit, the state court found that the Department of Corrections had negligently failed to provide adequate care for Saylor's PTSD

between June 11, 2002, and November 22, 2005. As the district court noted, the defendants presented no evidence suggesting that they were unaware of the prior state court judgment. For the purposes of the summary judgment analysis, there is no genuine dispute that all the defendants were actually aware of Saylor's serious medical needs and the risk of harm if he were denied adequate care. The district court found that Saylor had produced evidence—including his treatment records, his communications with prison staff, records of his transfer and administrative segregation, the affidavit of Dr. Christensen, and his own affidavit—to support his contention that the Department of Corrections had reverted to providing inadequate medical treatment as they had previously. This evidence, viewed in the light most favorable to Saylor, tends to show that shortly after the judgment in his state tort case, Saylor's treatment by Dr. Christensen was abruptly discontinued; his treatment plan, including his drug therapy, was interrupted; the responsible Department of Corrections officials failed to develop an appropriate alternative treatment plan; prison staff returned to their prior practice of failing to respond or responding inadequately to Saylor's communications; and Saylor was transferred and placed on the most restrictive confinement classification possible, despite that classification's incompatibility with his health needs. The evidence does not establish that Saylor caused or consented to the changes to his treatment, or that Saylor's transfer and placement in the Special Management Unit were necessary and consistent with an adequate treatment plan. Moreover, the district court found that there was sufficient evidence of each defendant's involvement in Saylor's care to establish that they may have been personally aware of or involved in this allegedly unconstitutional treatment.

The district court's factual findings, rather than being "blatantly contradicted by the record," are well supported and reflect careful consideration of the record evidence in the light most favorable to Saylor. Walton, 752 F.3d at 1116. Based on these findings, it would be possible to conclude that the defendants "actually knew

of, and [were] deliberately indifferent to or tacitly authorized" constitutionally deficient medical care for Saylor. McDowell, 990 F.2d at 435. The facts relevant to qualified immunity are genuinely disputed, precluding summary judgment on this basis. I would therefore affirm the district court's denial of summary judgment as to Saylor's Eighth Amendment deliberate indifference claim.

With regard to Saylor's First and Fourteenth Amendment claims, the district court did not make any factual determinations or conduct the required "thorough determination" of the defendants' entitlement to qualified immunity. See Payne, 749 F.3d at 701 (quoting O'Neil, 496 F.3d at 918). Without the district court's factual findings, we have no basis for our review of the grant or denial of qualified immunity. Therefore, when the district court fails or refuses to rule on qualified immunity, "our court only exercises its jurisdiction to compel the district court to decide the qualified immunity question." Id. I would remand Saylor's First and Fourteenth Amendment claims to the district court for it to properly conduct the qualified immunity analysis.

_____