# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-3891

_____

Patric Patterson

*Plaintiff - Appellant*

v.

Wendy Kelley, Deputy Director Arkansas Department of Correction; Randy
Watson, Varner Unit

*Defendant*s

Kennie Bolden; Jeremy Andrews; Willie Bankston; Richard Mazzanti; Christie
Simpson, Sergeant, Varner Unit, ADC; Anthony Bradley, Captain, Varner Unit, ADC

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Pine Bluff

_____

Submitted: April 12, 2018
Filed: September 5, 2018

_____

Before GRUENDER, ARNOLD, and GRASZ, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Patric Patterson brought this *pro se* civil rights action seeking monetary damages for injuries sustained when he was attacked by a fellow inmate at an Arkansas prison. He now appeals the district court's[1] denial of appointed counsel and adverse grant of summary judgment on his failure-to-protect claims against various corrections officials. For the reasons that follow, we affirm.

**I.**

On March 15, 2014, Patterson was housed in Barracks 13, an "open barracks" at the Arkansas Department of Correction's ("ADC") Varner Unit. That afternoon, Patterson and fellow inmate Michael Black had an altercation. Patterson subdued Black but released him after Black said, "Ok, it's over." Taking Black at his word and not wanting to be seen as a "snitch," Patterson did not to report the incident to prison officials. Unfortunately, his trust proved unfounded. Just after 3 a.m. the next morning, Black went to Patterson's bunk while he was sleeping and struck him repeatedly with a boot in a laundry bag. Over the course of this minute-long beating, Black also intermittently kicked Patterson. Black then returned several minutes later to deliver a few additional blows to Patterson, who had fallen to the ground and was nonresponsive. Patterson eventually received medical attention, but only after he managed to report the incident nearly ten minutes after the beating began. As a result of his injuries, Patterson underwent multiple surgeries and now has a glass eye.

Richard Mazzanti was the duty officer assigned to Barracks 13 and 14 on the night of the attack. The officer at this post is generally positioned in a control booth

---

[1]The Honorable J. Leon Holmes, United States District Judge for the Eastern District of Arkansas, adopting the report and recommendation of the Honorable J. Thomas Ray, Chief Magistrate Judge, United States District Court for the Eastern District of Arkansas.

located between the ends of the two 54-bed barracks, but the officer is also responsible for monitoring a hallway that runs along one side of Barracks 13 and 14. The hallway's glass walls allow the officer to see inside the barracks, including areas not visible from the control booth. That night, Mazzanti performed a visual check of the barracks from either the control booth or the hallway every thirty minutes, as required by ADC policy. A subsequent internal investigation confirmed that his post and all others were properly staffed during the relevant timeframe.

In March 2015, Patterson filed a verified, *pro se* complaint pursuant to 42 U.S.C. § 1983 against the Director of the ADC, Mazzanti, and six other officials at the Varner Unit. The complaint claims that Black was able to assault Patterson "as a result of the fact that there was no security in the barracks." In particular, the complaint highlights an ADC policy prohibiting officers from entering the barracks alone. The complaint also alleges that Mazzanti "was not present in the booth or in the vicinity of the barracks" at the time of the attack, although Patterson later acknowledged in deposition testimony that he had no knowledge of Mazzanti's "comings and goings."

The complaint asserts that the policy of assigning one officer to monitor two barracks was "inadequate" and that the officers' conduct, taken together, constituted "a crystal clear case of 'failure to protect.'" The complaint then identifies three "causes" of the incident:[2] (1) Manzzanti was "inattentive to his duties" despite "[k]nowing the propensity for violence in an unattended barracks"; (2) supervisory officials "knew that one . . . security officer was not enough security for two . . . barracks, housing 54 inmates each"; and (3) that each of the "defendants know that there are not enough staff members (security) to adequately maintain security, and

[2]In his complaint, Patterson identifies a fourth "cause"—that supervisory officials failed to adequately train Mazzanti. But given his failure to mention this allegation on appeal, we deem the failure-to-train claim abandoned. *See Burke v. N.D. Dep't of Corr. & Rehab.*, 294 F.3d 1043, 1044 (8th Cir. 2002) (per curiam).

provide direct supervision for the number of barracks there are and the number of inmates housed in those barracks."

After commencing the action, Patterson represented himself without issue for several months. During this time period, he filed a successful application to proceed *in forma pauperis*, gathered evidence to support his claims through interrogatories and affidavits, identified and substituted defendant-officials for John Doe defendants, and exhibited a good command of relevant law. But in response to the defendants' first motion for summary judgment, Patterson moved for appointed counsel. The magistrate judge denied this motion, finding that the "claims are not legally or factually complex" and that Patterson had proven a capable advocate. The district court also denied the motion for summary judgment as to all but two of the defendants, allowing the case to proceed.

Several months later, the remaining defendants moved to extend their deadline for dispositive motions by twenty days "due to the complexity of the claim involved, the amount of damages sought by the Plaintiff and the number of defendants involved." After the magistrate judge granted the extension on the basis of "good cause shown," Patterson filed a second motion for appointed counsel, which highlighted the court's apparently inconsistent findings as to the complexity of the case. The magistrate judge denied this second request, concluding that Patterson failed to show cause for reconsidering the denial of his original motion.

The defendants again moved for summary judgment, arguing that they were entitled to qualified immunity as to the failure-to-protect claims. Along with his response in opposition, Patterson attached a variety of documentary evidence. As relevant here, Patterson submitted Mazzanti's interrogatory answer, which stated that he had "performed visual checks approximately every 30 minutes from the hallway and my control booth" and further confirmed that he was in one of those two locations at the time of the assault. But an affidavit from a fellow inmate claimed that

officers regularly skipped security checks and noted that they "can't even see the whole barracks from those little windows [in the security booth]." Similarly, in his own affidavit, Patterson attested that "[o]fficers never came in the [barracks] unless it was count time or they had their own agenda"; that officers regularly logged security inspections that were not actually performed; and that "[t]he rack/bed where [he] was assaulted 23 times with a weapon and stomped on 6 times . . . cannot be seen from the booth." The end result, Patterson suggested, was that he had witnessed "many violent attacks, robberies, gambling, and homosexual activities" during his time at the Varner Unit.

The district court referred the matter to the magistrate judge, who issued a report and recommendation ("R&R") concluding that the defendant-officials were entitled to summary judgment. The R&R bifurcated its analysis of Patterson's failure-to-protect claim, first considering whether the defendants failed to protect Patterson against any *specific* threat before addressing whether they were deliberately indifferent to a *general* threat to prisoners in Barracks 13 and 14. Given that Patterson himself did not anticipate Black's attack, the magistrate judge found that the failure-to-protect claim concerning this specific threat failed. As to the general threat, the R&R began by addressing Patterson's allegations against Mazzanti. The magistrate judge concluded that, even if Manzzanti was completely inattentive to his duties on the night of the attack, his conduct was at worst grossly negligent, which is not enough to constitute a violation of the Eighth Amendment. *See Tucker v. Evans*, 276 F.3d 999, 1001-02 (8th Cir. 2002). The R&R then rejected Patterson's suggestion that Varner's open-barracks policy violates the "constitutional minimum conditions" we discussed in *Smith v. Arkansas Department of Corrections*, 103 F.3d 637, 648 (8th Cir. 1996), a case which applied only to the policies and practices at Arkansas's Cummins Unit at a time when that facility was under specific remedial court orders, *see Tucker*, 276 F.3d at 1002-03. Moreover, the R&R noted, Patterson failed to adduce any evidence that the defendants were subjectively indifferent to any

risks. Thus, the magistrate judge concluded that Patterson's failure-to-protect claims failed.

The district court adopted the R&R in full and granted summary judgment on the remaining claims. Patterson now appeals, arguing that the district court[3] abused its discretion in denying his motions for appointed counsel and erred in granting the officers summary judgment. We address these challenges in turn.

## II.

Patterson's primary claim on appeal is that the district court improperly refused his request for appointed counsel. As a result, Patterson argues, he was unable to marshal the facts to effectively support his claim. "We review the denial of a motion for appointment of counsel for an abuse of discretion, according the district court a good deal of discretion to determine whether representation is warranted given the nature of the case and the litigants." *Ward v. Smith*, 721 F.3d 940, 942 (8th Cir. 2013) (per curiam) (internal quotation marks omitted).

As Patterson himself acknowledged, *pro se* litigants have neither a constitutional nor a statutory right to appointed counsel in civil cases. *See Phillips v. Jasper Cty. Jail*, 437 F.3d 791, 794 (8th Cir. 2006). Instead, district courts may appoint counsel in such cases if convinced that an indigent plaintiff has stated a non-frivolous claim, *see* 28 U.S.C. § 1915(e), and where "the nature of the litigation is such that plaintiff as well as the court will benefit from the assistance of counsel," *see Johnson v. Williams*, 788 F.2d 1319, 1322 (8th Cir. 1986). "The relevant criteria for determining whether counsel should be appointed include the factual complexity

---

[3]While aware that the magistrate judge made several of the rulings at issue on appeal, for ease of reference, we adopt the parties' approach of referring to these as rulings of the district court unless otherwise noted.

of the issues, the ability of the indigent person to investigate the facts, the existence of conflicting testimony, the ability of the indigent person to present the claims, and the complexity of the legal arguments." *Phillips*, 437 F.3d at 794. Here, the district court considered these factors in rejecting Patterson's request for counsel, specifically finding that the facts and legal issues were not sufficiently complex to justify the appointment of counsel and that Patterson had proven capable of representing himself.

On appeal, Patterson makes four arguments to show that the district court abused its discretion in making this determination. Three plainly fail. First, Patterson claims that, as an inmate, he was unable to interview witnesses and secure relevant information. Second, he suggests that his inartfully worded interrogatories allowed defendants to give evasive answers. And third, although his appointed appellate counsel concedes that Patterson did "a fair job of researching the law," she argues that "this is complex litigation" requiring the assistance of counsel because the case involves administrative regulations and government funding issues.

None of these grounds are sufficient to show an abuse of discretion. As an initial matter, there is no evidence that the district court failed to consider these factors in concluding that appointed counsel was unnecessary. Indeed, Patterson presented similar arguments in his motions for appointed counsel. Moreover, given that most indigent prisoners will face similar challenges in bringing § 1983 claims, a finding that the district court abused its discretion on these bases would be tantamount to recognizing a right to appointed counsel for indigent prisoners in such cases. This we refuse to do.

Patterson's final point, which served as the focus of his second motion for appointed counsel, seemingly presents a closer question. Patterson claims that the district court abused its discretion by granting the defendants' motion to extend the deadline for dispositive motions— which was based, in part, on the complexity of the

case—while denying his first request for counsel because the case was not sufficiently complex. On closer inspection, however, this argument fails. As an initial matter, Patterson has not shown an actual inconsistency in these two rulings. While motions to extend deadlines and motions for appointed counsel both call for the exercise of a district court's discretion, the inquiries underlying these requests are far different. *Compare* Fed. R. Civ. P. 6(b)(1) (motion for extension), *with* 28 U.S.C. § 1915(e) (motion for appointed counsel). Moreover, in granting the defendants' motion for an extension, the district court did not necessarily signal agreement that the case was complex, given that the defendants provided three independent reasons for their requested extension, and the court did not specify which served as its basis for finding good cause. Thus, the district court could have granted the extension without necessarily concluding that the factual or legal issues were complex. However, even assuming that Patterson has identified an inconsistency and that the district court found the case to be complex, it still retained the discretion to deny his motion for appointed counsel. Complexity is only one factor for a court to consider in evaluating a motion for appointed counsel, and it is not dispositive of that inquiry. *See Johnson*, 788 F.2d at 1322-23. Significantly, Patterson proved adept at representing himself both before the district court and this court. Thus, while the district court had the discretion to appoint Patterson counsel on this record, it did not abuse this discretion in declining to do so.

### III.

Next, Patterson challenges the grant of summary judgment on his failure-to-protect claims. He argues that the record contains evidence that Mazzanti did not make security rounds on the night of the attack and that he was otherwise inattentive to his duties. Patterson also contends that the district court erred in concluding that the officers were not deliberately indifferent to a general risk of inmate attacks in Barracks 13 and 14 because they allegedly knew that the barracks were understaffed, that a single officer could not adequately secure both barracks, and that the security

-8-

policies were otherwise insufficient to safeguard inmates. "We review *de novo* the district court's grant of summary judgment based on qualified immunity." *LaCross v. City of Duluth*, 713 F.3d 1155, 1157 (8th Cir. 2013). "When reviewing a motion for summary judgment the question before this court is whether the record, viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Tucker*, 276 F.3d at 1001; *see also* Fed. R. Civ. P. 56(a).

Qualified immunity shields state officials from both civil liability and the burdens of litigation unless their conduct violates a clearly established right of which a reasonable person would have known. *Young v. Selk*, 508 F.3d 868, 871 (8th Cir. 2007). Thus, to overcome this defense, Patterson must show that: "(1) the facts, viewed in the light most favorable to [him], demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *See Saylor v. Nebraska*, 812 F.3d 637, 643 (8th Cir. 2016). Here, Patterson asserts that defendants violated his Eighth Amendment rights by failing to protect him from Black.

The Eighth Amendment "requires prison officials to 'take reasonable measures to guarantee' inmate safety by protecting them from attacks by other prisoners." *Young*, 508 F.3d at 872 (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Yet a constitutional claim does not lie every time one inmate attacks another. *Id.* Rather, prison officials violate the Eighth Amendment "only when they exhibit a 'deliberate or callous indifference' to an inmate's safety." *Tucker*, 276 F.3d at 1001. For this reason, to prevail on a failure-to-protect claim like Patterson's, an inmate must make two showings: "[1] an objective component, [that] there was a substantial risk of harm to the inmate, and [2] a subjective component, [that] the prison official was deliberately indifferent to that risk." *See id.*

First, insofar as Patterson alleges that the defendants failed to protect him from a specific threat posed by Black, his own inability to anticipate the surprise attack and his decision not to report his altercation with Black the previous afternoon defeat liability. *See id.* at 1001-02 (finding qualified immunity appropriate where a failure-to-protect claim arises from a "surprise attack" by another inmate). Patterson's specific claims against Mazzanti also fail. As an initial matter, we note that Patterson stated in his deposition testimony that he was unaware of Mazzanti's "comings and goings." This admission undercuts the allegation in his complaint that Mazzanti was either absent or inattentive during the attack. Nevertheless, even ignoring this evidence, Mazzanti's conduct represents—at most—gross negligence, which falls short of deliberate indifference as a matter of law. *See id.* (concluding that similar conduct "certainly points to negligence, and quite possibly even gross negligence, but that is insufficient to prove a violation of [an inmate's] constitutional rights."). Lastly, to the extent Patterson suggests that the Varner Unit's policies relating to open barracks, staffing levels, and security are *per se* unconstitutional under *Smith*, the magistrate judge correctly read *Tucker* as confining *Smith*'s holding to "a particular open barracks" during a particular period of time. *See id.* at 1002-03 (explaining that *Smith* was limited to a "specific prison unit" that was under a remedial court order at the time in question).

Patterson's remaining claim is that the defendants failed to protect him from a general risk of harm. He alleges that the barracks are understaffed and that prison officials routinely fail to conduct security checks. Assuming that Patterson has satisfied the *objective* component of his failure-to-protect claim, however, the record is devoid of evidence suggesting that any of the defendants were *subjectively* aware of, or deliberately indifferent to, a substantial risk of harm to inmate safety. *See id.* at 1001-03 (reversing the denial of qualified immunity related to an inmate attack where one guard was responsible for monitoring two open barracks from a control booth because there was no evidence of subjective indifference).

Patterson claimed in his affidavit that he witnessed "many violent attacks, robberies, gambling, and homosexual activities" during his time at the Varner Unit. But Patterson expressly stated that this misconduct "never got reported to ADC officials." It is true, as the dissenting opinion emphasizes, that an obvious risk of harm may justify an inference that prison officials subjectively disregarded that risk. *See Farmer*, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . ."); *see also Lenz v. Wade*, 490 F.3d 991, 995 (8th Cir. 2007). But to make such an inference, there must be some evidence showing that the defendants were exposed to the underlying facts revealing that risk. As the Supreme Court explained,

> [I]f an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, *and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk* and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

*Farmer*, 511 U.S. at 842 (emphasis added) (internal quotation marks omitted).

In suggesting that the risks to inmate safety were obvious, the dissenting opinion overlooks Patterson's own affidavit admitting that misconduct was not reported to the ADC.[4] Inferring subjective awareness here would be akin to adopting an objective test for deliberate indifference—an approach the Supreme Court explicitly rejected. *See Farmer*, 511 U.S. at 837. Indeed, a comparison of the record

---

[4]The prison's policy prohibiting an officer from entering a barracks without another officer present tells us little about prison officials' awareness of a substantial risk of harm to inmates. The unique risks faced by prison officers could justify such measures even where inmates faced no substantial risk of harm whatsoever.

in this case with that in *Krein v. Norris* is instructive. *See* 309 F.3d 487, 491-92 (8th Cir. 2002) (affirming a district court's denial of qualified immunity where evidence showed that the "defendants objectively and subjectively knew of, and deliberately disregarded, an excessive risk of harm to inmate health and safety"). In *Krein*, the record showed that:

> defendants' failure to abide by staffing requirements created an environment which posed a risk of harm to all inmates housed in the barracks area; the NCU had one guard for three barracks housing 150 inmates; defendants were or should have been aware of an inadequate staffing problem as early as August 1997 and yet they had made no staffing changes as of January 1998, when the attack occurred; the level of violence in Barracks # 1 was five times that of any other NCU barracks and yet staffing adjustments were not made to address the disparity; the number of isolation cells was inadequate; and ADC failed to keep track of the number and locations of assaults [in] the NCU.

*Id.* at 489-90, 492. The record here lacks such evidence justifying an inference that the defendants subjectively disregarded a substantial risk of harm.

Thus, we conclude that Patterson failed to raise a genuine issue of material fact as to whether the defendants were deliberately indifferent to a general risk of harm to inmates in Barracks 13 and 14. The district court did not err in granting the defendants qualified immunity.

## IV.

Accordingly, we affirm the denial of Patterson's request for appointed counsel and the grant of summary judgment to the defendant-officials.

GRASZ, Circuit Judge, concurring in part and dissenting in part.

I concur in part because, while the appointment of counsel would have been appropriate in this case, I agree with the majority that the district court's failure to do so was not reversible under our deferential abuse of discretion standard of review. I respectfully dissent with respect to the district court's grant of summary judgment and corresponding qualified immunity to the prison official defendants.

Under our Constitution, Patric Patterson is afforded the right to protection against cruel and unusual punishment, including protection from violence at the hands of other prisoners. *U.S. Const. amend. VIII*; *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Claims brought to enforce this constitutional right are protected against summary dismissal where there is a genuine dispute of material fact. Fed. R. Civ. P. 56(a). Because this procedural protection has been denied, any chance of Patterson vindicating his Constitutional right has been lost as well.

Security video shows Patterson was brutally and repeatedly assaulted in an open prison barracks. The attacks were so violent he was left with only one eye and must now walk with the aid of a cane. Although the attacks were recorded by a security camera, no prison official was watching. Neither did they hear his cries, even though the video shows the attacks roused virtually the entire barracks. Patterson eventually gained enough consciousness to make his way to a control booth before being taken for medical treatment. As horrific as the facts may be, however, they do not make Patterson's case; the law does.

On our *de novo* review, we must view the evidence in the light most favorable to Patterson and grant him the benefit of all reasonable inferences. *See Fed. Ins. Co. v. Great Am. Ins. Co.*, 893 F.3d 1098, 1102 (8th Cir. 2018). So viewing the evidence, I believe there is a genuine dispute of material fact as to whether the defendants were deliberately indifferent to the obvious risk of violence by inmates in the prison's open

-13-

barracks, resulting in the lengthy and brutal beating openly inflicted on Patterson at the hands of another inmate, all unnoticed by any prison official.

At the time he was attacked, Patterson was housed in the Varner Unit of the Arkansas Department of Correction. Barracks # 13 in the Varner Unit is a two-level barracks unit that held Patterson and fifty-three other inmates. Barracks #13 was monitored by a single guard, who was also responsible for monitoring the adjacent Barracks #14, which also held fifty-four inmates. The single guard was assigned to check on those one hundred eight inmates once every thirty minutes, either from the control booth between the two barracks or from a hallway with a glass wall that ran alongside both barracks. Prison policy prevented guards from entering the barracks without another guard present because of the known risk of violence by inmates.

As he was sleeping in the early morning of March 16, 2015, Patterson was attacked by another inmate, Michael Black. Security video footage shows the attack began at around 3:27 a.m. As most inmates were sleeping, Black approached Patterson's bed, wielding what appeared to be a pillow case or bag with a heavy object inside. Black attacked Patterson with a violent succession of twenty blows to the general area of Patterson's head, followed by a kick. During the initial attack, most of the other inmates in the lower level of the barracks woke up and sat up in their beds, though none intervened to stop the attack.

Patterson lay motionless on his bed after this initial attack. However, the violence was not over. Black stood over him and prodded him a couple of times, as if to get him to move. Black then stood over Patterson's bed for about a minute and a half, striking him three more times with the weapon. Black walked away from Patterson's bed, but returned a moment later and kicked him again, after which Patterson fell, limp, out of his bed and onto the floor. Black stood over or near Patterson for nearly another minute as he lay on the floor, before giving a "high-five" or "fist bump" to another inmate as he walked away. Black and other inmates milled

-14-

about the unit as Patterson lay on the floor. At around 3:32 a.m., Black went back over to where Patterson was lying and kicked him four times and punched him another two times.

No prison officials appeared to hear or see the repeated attacks, notice Patterson lying on the floor, or notice the fact the violent attacks disturbed the other inmates in the barracks. At around 3:38 a.m., a bloodied Patterson pulled himself up and staggered up the stairs from the lower level of Barracks #13, down the hallway to the end of the barracks, and then knocked on the window of the control booth to get someone's attention. He was let out of the barracks and escorted to the infirmary at 3:40 a.m., after which he was taken to the hospital. As a result of the attack, Patterson underwent two or three surgeries and ultimately lost one of his eyes. Patterson also testified that he has "nerve damage all on the side of [his] head [and] in [his] mouth," that his "sinuses are messed up all the time," that his "back's been messed up," so that he has to walk with a cane, and that he "get[s] muscle spasms in [his] back and on [his] face," which have to be treated with muscle relaxers.

To be clear, evidence of mere negligence by a prison guard is not sufficient to survive summary judgment. *See Farmer*, 511 U.S. at 835. Likewise, prison officials cannot be held liable for unforeseeable "surprise attacks." *See Krein v. Norris*, 309 F.3d 487, 491 (8th Cir. 2002). I agree with the majority in its conclusion that the evidence does not support an inference that the defendants knew about the *specific threat* posed by the *specific inmate* who attacked Patterson. But Patterson's arguments, as I read them, focus on the defendants' deliberate indifference to the risk of substantial harm posed by the overall lax security at the prison, not on the failure of the defendants to foresee the risk posed by the particular prisoner who attacked him. The absence of evidence showing that the defendants were aware of the risk posed to Patterson by Black in particular is not fatal to Patterson's claim. *See Farmer*, 511 U.S. at 843 ("Nor may a prison official escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to

-15-

inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault."); *Krein*, 309 F.3d at 491–92.

My disagreement with the majority is based on its application of the summary judgment standard. Regardless of whether Patterson would ultimately prevail, at this stage of the litigation we are required to resolve factual disputes in his favor and grant him the benefit of all reasonable inferences. *See Fed. Ins. Co.*, 893 F.3d at 1102.

I would conclude there is a genuine dispute of material fact as to whether the risk of inmate violence in the open barracks in this particular prison constituted a substantial risk of serious harm. The dangers posed by housing numerous violent felons together in open barracks has been the source of much litigation. *See, e.g.*, *Krein*, 309 F.3d at 491–92 (affirming the denial of prison official defendants' motion for summary judgment where the inmate plaintiff alleged and provided evidence showing that the defendants "fail[ed] to provide adequate security in an open barracks"); *Smith v. Arkansas Dep't of Corr.*, 103 F.3d 637, 644 (8th Cir. 1996) (noting "the danger to inmates living in open and unsupervised barracks," and that "[t]he thievery, assaults, and hand-crafted weapons that are common in the unsupervised environment of the open barracks illustrate its inherent danger," thus demonstrating a "threat of imminent harm").

Patterson testified that he had "observed many violent attacks [and] robberies" in the barracks. He said that inmates who were labeled as "snitches" were "hurt and/or killed." Patterson had been the victim of a prior assault. Defendant Mazzanti stated that he had been assaulted by inmates twice and had observed another inmate-on-inmate assault. As a firsthand observer, Patterson also stated in his verified complaint that there was "the propensity for violence in an unattended barracks," and "due to staff shortage, the likelihood of inmate assaults [was] highly likely." *See Roberson v. Hayti Police Dep't*, 241 F.3d 992, 994–95 (8th Cir. 2001) (discussing

verified complaints). Prison policy dictated that officers could not even enter the barracks unless accompanied by another officer because of the risk of violence by inmates. And at least one inmate had previously been killed by another inmate in the Varner Unit.

In *Jensen v. Clarke (Jensen II)*, this Court affirmed the district court's finding that the Nebraska State Penitentiary's practice of housing two inmates in a single cell and assigning cellmates on a random basis resulted in a substantial risk to inmates of serious harm by cellmate assault. 94 F.3d 1191, 1198 (8th Cir. 1996). While the record in this case is not as well developed as that in *Jensen II* — likely due in large part to Patterson litigating this case without the assistance of counsel and the defendants' refusal to produce in discovery any information about the number of prior assaults in Barracks #13 and the Varner Unit — there is nevertheless sufficient evidence upon which a reasonable factfinder could conclude that Patterson was "incarcerated under conditions posing a substantial risk of serious harm." *Smith*, 103 F.3d at 644 (quoting *Jensen v. Clarke (Jensen I)*, 73 F.3d 808, 810 (8th Cir. 1996)).

I would also conclude there is a genuine dispute of material fact as to whether the defendants knew of the risk of harm. *See Farmer*, 511 U.S. at 837 ("[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of . . . an excessive risk to inmate health or safety."). As the Supreme Court explained in *Farmer*, "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. As a result, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." On this issue too, we are required to view the evidence in the light most favorable to Patterson and give him the benefit of all reasonable inferences. *Fed. Ins. Co.*, 893 F.3d at 1102.

Viewing the evidence in the light most favorable to Patterson, a reasonable factfinder could conclude that the defendants knew about the obvious risk of violence inmates like Patterson faced at the hands of other inmates in this barracks. Patterson's verified complaint states that the defendants knew of the substantial risk of inmate violence and knew that this risk was exacerbated by a lack of sufficient security and supervision. He also stated that "[t]he Varner Unit is a Maximum Security Unit, housing a variety of potentially violent inmates." The prison's own policy against an officer entering prison barracks without another officer is evidence that the defendants knew of, and took seriously, the risk of inmate violence in the barracks. A reasonable factfinder could infer that the defendants knew that housing fifty-four violent felons together in an open barracks with minimal supervision and apparently no real-time video monitoring produces a substantial risk of inmate-on-inmate violence.

I would also conclude that there is a genuine dispute of material fact as to whether the defendants were deliberately indifferent to the risk of harm. The record contains conflicting evidence as to whether security checks were regularly performed and whether the entire barracks could even be seen from the control booth. While several defendants stated in interrogatory answers that security checks are performed every thirty minutes, Patterson presented an affidavit of a former Varner Unit inmate who worked cleaning hallways and witnessed many officers not performing security checks and sitting in their chairs in the control booth with their backs turned to the barracks. Patterson stated in his own affidavit that he had "witnessed [multiple] officers logging down security checks in their logs and never doing them." He also stated that he had seen zone sergeants not doing their security checks for 2 to 3 hours at a time and had seen "officers catching up their logs hours later[,] falsifying their documents." He also stated that he had seen "officers watching fights in the [barracks] and not reporting it to their superior." Patterson stated in his verified complaint that the guard on duty at the time of the attack "was not present in the booth or in the vicinity of the barracks where he could observe the activity in the

-18-

barracks," but that the guard "knew that if he did not pay attention to what was going on inside the barracks with direct supervision, the potential for inmate assaults existed."

It is undisputed that security checks were not regularly performed *inside* the barracks and there is conflicting evidence regarding whether the barracks can be safely monitored from the outside. Defendant Bolden stated, "Due to [the fact] the wall facing the hall is made of glass, visual checks can be conducted from the hallway and the control booth for each barracks." However, Patterson stated that "[t]he rack/bed where I was assaulted 23 times with a weapon and stomped on 6 times for approx[imately] 11 minutes cannot be seen from the booth." He also said that in the hallway, only one barracks is visible at a time — and one officer is responsible for monitoring two different two-level barracks. Another inmate who had worked in the hallways doing janitorial work stated in his affidavit that "you can't even see the whole barracks from those little [control booth] windows."

The statements in the record by the defendants are ambiguous as to whether they claim security checks were performed every thirty minutes from *both* the booth and hallway or from *either* the booth and hallway, which is relevant because of the evidence that the entire barracks could not be seen from the security booth (and this ambiguity must be construed in favor of Patterson on summary judgment). Moreover, the record establishes activity in the barracks was recorded on security cameras, but monitoring the video was not described by the defendants as part of the security routine. A reasonable factfinder could conclude that the defendants knew their security policy as practiced was insufficient to protect inmates from the obvious and substantial risk of violence by other inmates and that the defendants disregarded that risk. The fact that Patterson was openly and repeatedly attacked with most of the other inmates in the unit looking on, while prison officials apparently had no idea this was occurring until a blood-covered Patterson pulled himself off the floor and

staggered up the stairs and down the hall to the control booth window, lends support to that conclusion.

The applicable legal standard here does not allow for summarily rejecting Patterson's claim without a trial. The Federal Rules of Civil Procedure contain a clear requirement that a movant seeking summary judgment must show that "no genuine dispute as to any material fact" exists. The "material fact" provision is a textual standard authorized by Congress, 28 U.S.C. §§ 2071–2074, and this Court, under *de novo* review, must apply the rule as written. Under this standard, I believe Patterson's claim should survive.

In sum, viewing the evidence in the light most favorable to Patterson and granting him the benefit of all reasonable inferences, I would conclude there is a genuine dispute of material fact precluding summary judgment. I would affirm the district court's denial of Patterson's motions for appointed counsel under our abuse of discretion standard of review, but reverse its grant of the defendants' motion for summary judgment.

_____